# IN THE SUPREME COURT OF IOWA

No. 16–1998

Filed June 22, 2018

**STATE OF IOWA,**

> Appellee,

vs.

**KEYON HARRISON,**

> Appellant.

---

Appeal from the Iowa District Court for Polk County, Paul Scott, Judge.

A juvenile offender appeals his conviction for first-degree felony murder and challenges his sentence of life imprisonment with the possibility of immediate parole as cruel and unusual punishment under the Iowa and United States Constitutions. **AFFIRMED.**

Matthew G. Sease of Kemp & Sease, Des Moines, for appellant.

Thomas J. Miller, Attorney General, Louis S. Sloven, Assistant Attorney General, John P. Sarcone, County Attorney, and Jeffrey K. Noble and Shannon Archer, Assistant County Attorneys, for appellee.

Brent Michael Pattison of Drake Legal Clinic, Des Moines, and Marsha L. Levick, of Juvenile Law Center, Philadelphia, Pennsylvania, for amici curiae Juvenile Law Center, Center on Wrongful Convictions of Youth, and the Center for Law, Brain and Behavior.

**ZAGER, Justice.**

Keyon Harrison appeals his conviction for first-degree murder. Harrison argues applying the felony-murder rule to juvenile offenders based upon a theory of aiding and abetting violates the Iowa and United States Constitutions. Harrison also presents as-applied and categorical constitutional challenges to his sentence claiming a sentence of life with the possibility of parole for a juvenile offender who was convicted of felony murder constitutes cruel and unusual punishment under the Iowa and United States Constitutions. Further, Harrison maintains the trial court failed to provide the jury with proper instructions regarding the types of assault required to establish the forcible felony robbery element of felony murder. Finally, Harrison presents ineffective-assistance-of-counsel claims alleging he was prejudiced by the errors of his trial counsel, including trial counsel's failure to request certain jury instructions and failure to object to certain evidence presented at trial. For the reasons set forth below, we affirm the conviction and sentence.

### I. Background Facts and Proceedings.

On November 7, 2014, starting at approximately 3:45 p.m., Aaron McHenry began receiving calls and text messages from Keith Collins who was looking to buy marijuana from McHenry. Collins, then seventeen years old, and Keyon Harrison, then sixteen years old, were at an Oasis store at the time, and they initially wanted to meet McHenry at the Oasis store. However, McHenry did not know where the Oasis store was located. Therefore, McHenry arranged for them to meet at the Family Dollar store near the 2600 block of Hickman Lane around 4:20 p.m. The purpose of the meeting was to complete the sale of marijuana from McHenry to Collins and Harrison.

At 4:23 p.m., Shirley Dick was taking her dogs outside when she saw a black male, later identified as Collins, walking near her home at 2600 Hickman Lane. Dick approached Collins to see if there was anything she could help him with, and Collins told her that he was waiting for his girlfriend. Dick told Collins there were no kids that lived on her street, and Collins turned away without responding to her. Thereafter, Dick noticed Jorge Gutierrez, a nearby neighbor, chasing his dog as it ran from his house in the direction of Dick's house. Dick waited outside, offering to help Gutierrez retrieve his dog.

While Gutierrez was retrieving his dog and returning home, he observed Collins sitting on a retaining wall on Hickman Lane. Gutierrez also saw McHenry and Harrison walking from 26th Street in the direction of Hickman Lane. Gutierrez saw McHenry and Harrison begin to walk faster, and they eventually "started to, like, push each other." Nevertheless, Gutierrez went back inside, and Shirley Dick turned to walk back towards her home.

As she turned around, Dick heard gunshots, and she saw Collins take off running underneath nearby bushes. Dick testified that Collins was "maybe five feet" from McHenry when she turned around, but she did not see Harrison or anyone else in the area.[1] Dick then called 911. Gutierrez also heard the gunshots and turned around to see McHenry lying on the ground. Gutierrez saw Collins and Harrison start running together "away from Hickman Road."

---

[1]Shirley Dick testified about the events she witnessed surrounding McHenry's death at Collins's trial, but she passed away before she was able to testify at Harrison's trial. The parties agreed to read her testimony into the record at Harrison's trial, and her testimony was admitted to the court as an exhibit. The parties also agreed to have Dick's 911 call reporting the gunshots played at trial.

Several other neighbors told police they saw two black males running away from the area, and two nearby homeowners provided police with security camera footage from their homes showing a black male running away from the area. Camera footage at Broadlawns Hospital, taken shortly after the shooting, shows Collins and Harrison together at the hospital where Collins was treated for an injury to his right hand. Harrison and Collins then went to meet up with Harrison's girlfriend at her residence. The girlfriend testified that when she joined them, she saw Harrison "was holding two bags of marijuana in his hands, like baseball size". Thereafter, the group went to a store to buy blunt wraps for smoking marijuana, and Harrison and Collins smoked some of the marijuana when they returned to the girlfriend's house. Harrison and Collins then returned to Collins's apartment around 8:00 p.m.

When police responded to the 911 call about a shooting at Hickman Lane, they discovered Aaron McHenry's dead body. McHenry had multiple gunshot wounds to the head, torso, upper back, and arm, including a couple of wounds that contained signs indicating he was shot from close range. Police were able to identify Collins as a suspect soon after the shooting. Police contacted the Hoover High School resource officer after another Hickman Lane neighbor told them that one of the individuals went to Hoover High School with her. She also told police that people at the school thought he resembled the rapper Bobby Shmurda. The resource officer identified two individuals who fit that description. Later, the police provided the neighbor with two separate photo arrays. The neighbor was able to positively identify Collins as one of the individuals running from the area of the shooting. Police subsequently obtained a search warrant for Collins's apartment, which they executed about twelve hours after responding to the scene of the shooting.

Harrison was with Collins at the apartment when the police executed the search warrant. Collins had marijuana in his backpack, and Harrison had marijuana on his person. Both packages of marijuana confiscated from Collins and Harrison were identical in amount and packaging. Police recovered the cell phone used to communicate with McHenry, but they did not recover a gun during the search. The police then took Harrison into custody. After Harrison's mother arrived, Detective Youngblut provided Harrison and his mother with his *Miranda* rights, and they agreed to sign a written waiver of his *Miranda* rights.

Youngblut conducted Harrison's questioning and recorded the entire interview and events surrounding the interview at the police station. The recording equipment was visible, and there was a sign outside of the interview room informing people that the room was audio and video recorded. Harrison's mother was aware of the recording. While police were not in the room, she informed Harrison that the room was being recorded. During the interview, Harrison was repeatedly dishonest with Youngblut. Harrison told Youngblut that Collins did not have a cell phone. Harrison told Youngblut that he was not with Collins around the time of the murder because he was somewhere else and that he went to Broadlawns Hospital with his girlfriend from his girlfriend's house to meet up with Collins.

When Youngblut left the room, Harrison's mother accused Harrison of lying and told Harrison, "I can't help you if you lyin' to me." In response, Harrison stated,

> Alright mama. Look, look. We was walking, [Collins]'s like, "I got a lick." I'm like, "Bro, no, bro, you're not going to do it." He's like, "Bro, I've got a lick. I need it. I need to go to Chicago." He's like—because he's trying to go to Chicago or whatever with his mom. He's like, "Bro, I need it." So I'm like, "Bro, you can hit that lick but bro, I'm just going to stay on the side." So we walking down, we walking down the street and then he was . . . .

Harrison's mother then interjected to remind Harrison that they were being recorded before Harrison could finish the rest of the sentence. A "lick" is slang for a robbery, and the cell phone the police recovered from Collins listed McHenry's phone number under the name "Lick." Investigators found marijuana residue in McHenry's pants pocket but no marijuana, which they believed indicated someone had stolen marijuana from him.

The State charged both Harrison and Collins with first-degree murder. They were tried separately. The State initially charged Harrison with first-degree murder in violation of Iowa Code sections 707.1 and 707.2 and first-degree robbery in violation of Iowa Code sections 711.1 and 711.2 (2015). Harrison's trial began on October 3, 2016. On October 4, before the presentation of any evidence, the State filed an amended trial information that dropped the charge of first-degree robbery.

The State conceded during trial that "the evidence tends to suggest that it was probably [Harrison's] friend and companion Keith Collins" who shot McHenry, and it dismissed the charge of premeditated murder in the first-degree under Iowa Code section 707.2(1)(*a*). At trial, the State only presented the theory of first-degree murder based upon the felony-murder rule under Iowa Code section 707.2(1)(*b*). The State argued Harrison was guilty of aiding and abetting in the robbery and murder of McHenry. At the conclusion of the trial, the jury returned a unanimous verdict finding Harrison guilty of first-degree murder in violation of Iowa Code sections 707.1 and 707.2(1)(*b*) for killing McHenry while participating in a forcible felony, the robbery. Harrison was sentenced to life in prison with immediate parole eligibility. Harrison filed a timely appeal, which we retained.

**II.  Standard of Review.**

We review alleged violations of state or federal constitutional rights de novo.  *State v. Coleman*, 907 N.W.2d 124, 134 (Iowa 2018).  In doing so, we evaluate each case "in light of its unique circumstances" by examining the "totality of the circumstances as shown by the entire record" to "make an independent evaluation."  *State v. Krogmann*, 804 N.W.2d 518, 522–23 (Iowa 2011) (quoting *State v. Brooks*, 760 N.W.2d 197, 204 (Iowa 2009)).  Further, "[w]e may review a challenge that a sentence is illegal at any time."  *State v. Zarate*, 908 N.W.2d 831, 840 (Iowa 2018).  Though we typically review challenges to illegal sentences for correction of legal errors, our standard of review for an allegation of an unconstitutional sentence is de novo.  *Id.*

Our standard of review for challenges to jury instructions is for correction of errors at law.  *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016).  "We do not consider an erroneous jury instruction in isolation, but look at the jury instructions as a whole."  *State v. Murray*, 796 N.W.2d 907, 908 (Iowa 2011).  Our standard of review for claims of ineffective assistance of counsel is de novo.  *State v. Schlitter*, 881 N.W.2d 380, 388 (Iowa 2016).  "Ineffective-assistance-of-counsel claims require a showing by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice."  *Id.*

**III.  Analysis.**

Harrison presents a number of claims on appeal.  First, he maintains the felony-murder rule violates the Due Process Clause of both the Iowa and United States Constitutions when it is applied to juvenile offenders pursuant to a theory of aiding and abetting.  Second, Harrison argues a sentence of life with the possibility of immediate parole eligibility for a juvenile offender convicted of first-degree murder under the felony-

murder rule is unconstitutional both as applied to him and on its face under the Cruel and Unusual Punishment Clauses of the Iowa and United States Constitutions. Third, Harrison claims the trial court did not provide proper jury instructions on the specific types of assault necessary to establish a felonious robbery. Finally, Harrison advances ineffective-assistance-of-counsel claims alleging his trial counsel breached essential duties that resulted in prejudice by failing to request certain jury instructions and failing to object to certain evidence presented at trial. We address these claims in turn.

**A. The State and Federal Juvenile Sentencing Landscape.** Article I, section 17 of the Iowa Constitution and the Eighth Amendment of the United States Constitution provide Iowans convicted of a crime with the right to be free from cruel and unusual punishment. U.S. Const. amend. VIII; Iowa Const. art. I, § 17. This fundamental constitutional tenet "flows from the basic 'precept of justice that punishment for crime should be graduated and proportioned' to both the offender and the offense." *Miller v. Alabama*, 567 U.S. 460, 469, 132 S. Ct. 2455, 2463 (2012) (quoting *Roper v. Simmons*, 543 U.S. 551, 560, 125 S. Ct. 1183, 1190 (2005)); *State v. Propps*, 897 N.W.2d 91, 98 (Iowa 2017). In 2005, the United States Supreme Court decided the first in a trilogy of cases interpreting the Cruel and Unusual Punishment Clause under the Eighth Amendment in relation to juvenile sentencing, which has transformed the juvenile sentencing landscape. *See generally Miller*, 567 U.S. 460, 132 S. Ct. 2455; *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010); *Roper*, 543 U.S. 551, 125 S. Ct. 1183. An overview of these changes is necessary to provide background for our analysis of Harrison's constitutional challenge to the felony-murder rule and his sentence of life imprisonment with immediate parole eligibility.

First, in *Roper*, the Supreme Court held that imposing capital punishment on juvenile offenders constitutes cruel and unusual punishment under the Eighth Amendment. 543 U.S. at 568, 126 S. Ct. at 1194. In doing so, the Court emphasized the differences between adult and juvenile offenders that "render suspect any conclusion that a juvenile falls among the worst offenders"—namely, the differences in maturity, sense of responsibility, vulnerability to peer pressure and negative influences, and the development of personality traits. *Id.* at 569–70, 125 S. Ct. at 1195. Second, in *Graham*, the Supreme Court held that sentencing juvenile offenders convicted of nonhomicide offenses to life imprisonment without the possibility of parole constitutes cruel and unusual punishment under the Eighth Amendment. 560 U.S. at 74, 130 S. Ct. at 2030.

Finally, in *Miller*, the Supreme Court prohibited all mandatory sentences of life imprisonment without the possibility of parole for juvenile offenders under the Eighth Amendment. 567 U.S. at 479, 132 S. Ct. at 2469. The Court stated, "Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477, 132 S. Ct. at 2468. Nevertheless, the Court did not prohibit all sentences of life imprisonment without the possibility of parole. *Id.* at 480, 132 S. Ct. at 2469. Instead, the Court held that sentencing courts must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison" before issuing a sentence of life imprisonment without the possibility of parole to a juvenile offender. *Id.*

Following *Miller*, the Iowa Governor commuted the sentences of all thirty-eight juvenile offenders serving statutorily mandated sentences of life without parole to sentences of life without parole eligibility for sixty years with no credit for earned time. *See State v. Ragland*, 836 N.W.2d 107, 110–11 (Iowa 2013). Shortly thereafter, we held that *Miller* applied retroactively, and the Governor's commutations to life without parole for sixty years with no credit for earned time, amounted to *de facto* sentences of life without the possibility of parole and mandated the individualized sentencing process outlined in *Miller*. *Id.* at 117, 122. The *Roper–Graham–Miller* trilogy, and our holding in *Ragland,* set the course for drastic changes to juvenile sentencing under the Iowa Constitution.

First, in *State v. Null*, we held that sentencing a juvenile offender to 52.5 years imprisonment triggered *Miller*'s individualized sentencing requirement noting "[t]he prospect of geriatric release, if one is to be afforded the opportunity for release at all, does not provide a 'meaningful opportunity' to demonstrate the 'maturity and rehabilitation' required to obtain release and reenter society." 836 N.W.2d 41, 71 (2013) (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030). In *State v. Pearson*, we similarly held that the individualized sentencing requirement set forth in *Miller* applied under the Iowa Constitution to a juvenile offender's sentence of consecutive terms totaling thirty-five years imprisonment without parole eligibility for nonhomicide offenses. 836 N.W.2d 88, 96 (Iowa 2013).

In *State v. Lyle*, we held that "the sentencing of juveniles according to statutorily required mandatory minimums does not adequately serve the legitimate penological objectives in light of the child's categorically diminished culpability." 854 N.W.2d 378, 398 (Iowa 2014). As a result, we held that article I, section 17 of the Iowa Constitution prohibits all mandatory minimum prison sentences for juvenile offenders. *Id.* at 400.

Additionally, we established the following necessary factors for a district court to consider in deciding whether a juvenile offender warrants the minimum period of incarceration without parole:

> (1) the age of the offender and the features of youthful behavior, such as "immaturity, impetuosity, and failure to appreciate risks and consequences"; (2) the particular "family and home environment" that surround the youth; (3) the circumstances of the particular crime and all circumstances relating to youth that may have played a role in the commission of the crime; (4) the challenges for youthful offenders in navigating through the criminal process; and (5) the possibility of rehabilitation and the capacity for change.

*Id.* at 404 n.10 (quoting *Miller*, 567 U.S. at 477, 132 S. Ct. at 2468).

In *State v. Louisell*, we vacated a sentence for a determinate term of years in prison, holding that sentencing juvenile offenders convicted of first-degree murder to a fixed term of years was not an option "[b]ecause there was no statutory authority for the determinate sentence" and "judges may only impose punishment authorized by the legislature within constitutional constraints." 865 N.W.2d 590, 598 (Iowa 2015). We also rejected the defendant's argument on ripeness grounds that she would be denied a meaningful opportunity for release were she to become parole eligible given the low rates at which the state parole board had actually granted parole to eligible offenders. *Id.* at 601–02. Nevertheless, we reiterated that "juveniles convicted of crimes must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation'—if a sentencing judge, exercising discretion, determines parole should be available." *Id.* at 602 (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030).

Further, in *State v. Seats*, we expounded upon the sentencing factors espoused in *Lyle* and *Miller* that a sentencing court must consider

"before sentencing a juvenile to life in prison without the possibility of parole." 865 N.W.2d 545, 555–57 (Iowa 2015). In applying these factors, we first established that "the presumption for any sentencing judge is that the judge should sentence juveniles to life in prison with the possibility of parole for murder unless the other factors require a different sentence." *Id.* at 555. Additionally, we explained that the sentencing factors require sentencing courts to acknowledge the differences between children and adults and consider the offender's "family and home environment," "the circumstances of the homicide offense," any substance abuse that may have played a role in the juvenile's offense, and that juveniles have a greater capacity for rehabilitation than adults do. *Id.* at 555–56 (quoting *Miller*, 567 U.S. at 477, 132 S. Ct. at 2468).

In *State v. Sweet*, we adopted "a categorical rule that juvenile offenders may not be sentenced to life without the possibility of parole under article I, section 17 of the Iowa Constitution." 879 N.W.2d 811, 839 (Iowa 2016). Underlying this holding was our finding that a sentence of life without the possibility of parole required the sentencing judge to "do the impossible, namely, to determine whether the offender is 'irretrievably corrupt' at a time when even trained professionals with years of clinical experience would not attempt to make such a determination." *Id.* at 837. We concluded that the parole board is in the best position to determine whether the offender is invariably corrupt. *Id.* at 839.

In *Propps*, we upheld a juvenile offender's indeterminate sentence with no mandatory minimum and immediate parole eligibility because it gave the juvenile the "potential for immediate parole if rehabilitation, maturity, and reform have been demonstrated." 897 N.W.2d 91, 101 (Iowa 2017). Moreover, in *State v. Roby*, we further developed the sentencing factors first set forth in *Lyle*, explaining that these factors should generally

mitigate the punishment of a juvenile offender so that sentencing courts can devise a "punishment that serves the best interests of the child and of society." 897 N.W.2d 127, 144 (Iowa 2017) (quoting *Lyle*, 854 N.W.2d at 402). We also declined to categorically prohibit imposing a minimum term of incarceration without immediate parole eligibility on juvenile offenders convicted of first-degree murder as long as such sentences were only imposed after the sentencing judge considered the necessary mitigating factors associated with youth. *Id.* at 148. Finally, in *Zarate*, we held that article I, section 17 of the Iowa Constitution did not categorically prohibit sentencing juveniles convicted of first-degree murder to "life with the possibility of parole after serving a minimum term of confinement as determined by the court," or life with the possibility of immediate parole. 908 N.W.2d at 843, 856 (quoting Iowa Code § 902.1(2)(*a*)(2)).

**B. Applying the Felony-Murder Rule to Juvenile Offenders.** Harrison argues applying the felony-murder rule to juvenile offenders when their liability is grounded on a theory of aiding and abetting violates due process under the Iowa and United States Constitutions. Specifically, Harrison alleges the felony-murder rule is premised on the assumption that juvenile offenders who participate in a forcible felony can appreciate the potential consequences of their participation even though juvenile offenders are "not developed enough to appreciate not only the assumption, but the natural consequence of the [forcible felony] (i.e. the murder)." Harrison relies primarily on our state and federal juvenile sentencing jurisprudence which recognizes that there is a "fundamental and virtually inexorable difference between juveniles and adults for the purposes of punishment." *Lyle*, 854 N.W.2d at 393. Further, Harrison reasons, even if he did understand the potential consequences of his participation in the robbery, science on juvenile development indicates

that he was incapable of controlling his impulses with regard to his participation in the murder.[2]

Iowa Code section 707.2(1)(*b*) states, "A person commits murder in the first degree when the person commits murder under any of the following circumstances . . . . The person kills another person while participating in a forcible felony." Iowa Code § 707.2(1)(*b*) (2015).[3] This definition of first-degree murder is known as the felony-murder rule, and it "began as a common-law doctrine of criminal law that any death resulting from the commission or attempted commission of a felony constitutes murder." *State v. Tribble*, 790 N.W.2d 121, 124 (Iowa 2010). "Felonies that have historically been used to support application of the felony-murder doctrine are those that are particularly serious or inherently dangerous." *Id.* In Iowa, the legislature has specified which felonies are classified as a "forcible felony" under the felony-murder rule in section 702.11(1). A forcible felony includes "any felonious child endangerment, assault, murder, sexual abuse, kidnapping, robbery, human trafficking, arson in the first degree, or burglary in the first degree." Iowa Code § 702.11(1).

The felony-murder rule aims to deter people from committing those felonies the legislature has deemed inherently dangerous to the life of others. *See Tribble*, 790 N.W.2d at 127. To promote deterrence, the rule transforms those felonies "into first-degree murder if a person is killed in the course of the felony, even though the felon had no specific intent or

---

[2]The State argues that Harrison did not preserve error on this issue since he waited to raise it until after the State had presented its case on the felony-murder theory. We assume error is preserved without addressing this challenge.

[3]Though Harrison was convicted in 2016, there has been no change in the felony-murder statute since the time of his trial. *See* Iowa Code § 707.2(1)(*b*) (2016).

premeditation otherwise necessary to elevate the killing of another into first-degree murder." *Id.* at 127–28. Consequently,

> [w]hen a person engages in conduct dangerous enough to be identified by our legislature as a predicate felony for felony murder, the elements of the felony-murder statute are satisfied if the person also engages in an act causing death while participating in the dangerous conduct.

*Id.* at 126. "In other words, our legislature adopted felony murder to deter the commission of felonies, but not by totally eliminating the relationship between criminal intent and criminal liability." *Id.* at 128.

In contrast to first-degree murder under section 707.2(1)(*a*), which requires a showing that the defendant "willfully, deliberately, and with premeditation kills another person," first-degree murder under the felony-murder rule only requires a showing that the defendant acted with the specific intent to commit the predicate felony that led to the killing. *Compare* Iowa Code § 707.2(1)(*a*), *with id.* § 707.2(1)(*b*). This difference between the intent required for premeditated murder and felony murder has produced confusion and a lack of conformity in the way our court and other courts have explained the felony-murder rule in the past. For example, Harrison notes that our court previously stated in *State v. Heemstra*, that the elements of premeditated murder under section 707.2(1)—namely that the murder was committed "willfully, deliberately, and with premeditation"—"are presumed to exist if the State proves participation in the underlying forcible felony" for a charge of felony murder. 721 N.W.2d 549, 554 (Iowa 2006) (quoting Iowa Code § 707.2(1) (2001)). Harrison capitalizes on this language in his argument that the felony-murder rule creates a conclusive presumption that the defendant committed the killing with malice aforethought in violation of the Due Process Clauses of the Iowa and United States Constitutions.

The Fifth and Fourteenth Amendments of the United States Constitution, and Article I, section 9 of the Iowa Constitution, prohibit the state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV; Iowa Const. art. I, § 9. " 'Due process requires fundamental fairness in a judicial proceeding,' so a trial that is fundamentally unfair violates the guarantees of due process in the United States and Iowa Constitutions." *More v. State*, 880 N.W.2d 487, 499 (Iowa 2016) (quoting *State v. Becker*, 818 N.W.2d 135, 148 (Iowa 2012), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 & n.3). "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 1073 (1970). We have recognized that "a mandatory presumption violates the due process clause because it undermines the fact finder's responsibility to find the ultimate facts beyond a reasonable doubt." *State v. Winders*, 359 N.W.2d 417, 419 (Iowa 1984). "[T]his presumption would conflict with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime." *Sandstrom v. Montana*, 442 U.S. 510, 522, 99 S. Ct. 2450, 2458 (1979) (emphasis omitted) (quoting *Morissette v. United States*, 342 U.S. 246, 275, 72 S. Ct. 240, 256 (1952)).

We have previously addressed a due process challenge like the one Harrison now makes regarding the alleged presumptions incorporated in the felony-murder rule, as well as application of the felony-murder rule to defendants who were convicted of felony-murder for aiding and abetting a felony. *See generally Conner v. State*, 362 N.W.2d 449 (Iowa 1985). Similar to this case, the defendant in *Conner* claimed "that conclusively attributing malice aforethought to him in relation to the killing, merely

from his participation in the underlying felony," violated his right to due process under the Fourteenth Amendment of the United States Constitution. *Id.* at 455. Like Harrison, the defendant argued that the felony-murder rule creates an unconstitutional presumption that takes the burden off the state to prove the requisite culpability for murder. *Id.* at 456. We rejected this argument, holding it was "misplaced" because "[a]ccomplice liability . . . is a matter of substantive law that places responsibility on a wrongdoer for the direct and indirect consequences of his joint criminal conduct with another." *Id.; see also State v. Nowlin*, 244 N.W.2d 596, 604–05 (Iowa 1976) ("The felony-murder statute does not relieve the State of the burden of proving essential elements of first-degree murder. The elements [of willfulness, deliberation, and premeditation] alleged by defendant to be essential are not essential [to felony murder]."). Finally, we exclaimed, "The State, through the enactment of laws, has a right to prescribe the nature of the acts that constitute criminal conduct." *Conner*, 362 N.W.2d at 456.

Despite our rejection of Harrison's argument in *Conner*, Harrison argues *Conner* is not controlling because we did not decide *Conner* under the Iowa Constitution, it did not involve a juvenile offender, and it directly contradicts our recognition in *Heemstra* of the presumptions inherent to the felony-murder rule. While we acknowledge our court previously stated in *Heemstra* that the felony-murder rule presumes the defendant committed the killing with malice, we were not speaking to the constitutional issue now raised. *See* 721 N.W.2d at 554. As such, that language is not controlling in this case.

The felony-murder rule does not create a conclusive presumption that the defendant committed the murder "willfully, deliberately, and with premeditation," because these are not elements of first-degree felony

murder in Iowa. *Nowlin*, 244 N.W.2d at 604–05. The substantive statutory definition of first-degree felony murder in Iowa does not include these elements since the state is only required to show the specific intent to commit the predicate felony rather than show the defendant acted with premeditation and deliberation to commit murder. *See* Iowa Code § 707.2(1)(*b*). This is a substantive rule of law in Iowa and not simply an evidentiary shortcut to find malice or a presumption that malice existed on the part of the defendant. Consequently, whether the defendant acted "willfully, deliberately, and with premeditation" is wholly irrelevant when the defendant is charged with felony murder, regardless of the dicta Harrison cites from *Heemstra*. "In that event the 'conclusive presumption' is no more than a procedural fiction that masks a substantive reality, to wit, that as a matter of law malice is not an element of felony murder." *People v. Dillon*, 668 P.2d 697, 717 (Cal. 1983) (en banc). Therefore, it does not follow that the felony-murder rule violates the Due Process Clauses of the Iowa or United States Constitutions by creating a conclusive and unconstitutional presumption about the defendant's intent to commit murder. Our ruling is supported by a number of other states, which have likewise considered and rejected claims that the felony-murder rule violates due process because it creates an unconstitutional presumption that the defendant committed the killing with malice aforethought.[4]

---

[4]*See, e.g.*, *State v. Herrera*, 859 P.2d 131, 140 (Ariz. 1993) (en banc) (rejecting a constitutional challenge to the Arizona felony-murder rule that claimed the rule unconstitutionally presumed the defendant's intent to kill based on the intent to commit the underlying felony); *Dillon*, 668 P.2d at 717–18 (holding the felony-murder rule does not create a conclusive presumption of the existence of an element of the crime in violation of the Due Process Clause of the Fourteenth Amendment since malice aforethought is not an element of felony murder); *State v. Goodseal*, 553 P.2d 279, 286 (Kan. 1976) (holding the felony-murder rule did not constitute cruel and unusual punishment or the denial of equal protection and due process since "it is to protect human life, represents sound public policy, is reasonably related to the end sought to be accomplished and is not constitutionally impermissible"), *overruled on other grounds by*

By asking us to rely on a procedural fiction to hold that the felony-murder rule creates an unconstitutional presumption about the intent of juvenile offenders, Harrison is essentially asking us to implement greater due process rights for juvenile offenders than adult offenders. Harrison is right that we have recognized that "children are constitutionally different from adults," *Seats*, 865 N.W.2d at 556 (quoting *Miller*, 567 U.S. at 471,

---

*State v. Underwood*, 615 P.2d 153, 162–63 (Kan. 1980); *Evans v. State*, 349 A.2d 300, 329–30, 336–37 (Md. Ct. Spec. App. 1975) (holding the felony-murder rule did not violate due process because it is not a "mere pale reflection[ ] of willful, deliberate, and premeditated killing" since it has a different substantive definition of murder); *Commonwealth v. Watkins*, 379 N.E.2d 1040, 1049 (Mass. 1978) (The felony-murder rule is not unconstitutional under the Fourteenth Amendment because "[t]he Commonwealth is not, pursuant to the operation of the felony-murder rule, 'relieved' of its duty prescribed by the United States Supreme Court in *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed 2d 368 (1970), of proving every fact necessary to the crime as charged beyond a reasonable doubt. Nor is the burden of proof as to an element of the crime charged 'affirmatively shifted' from the Commonwealth to the defendant as prohibited by the Supreme Court in *Mullaney v. Wilbur*, 421 U.S. 684, 701, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975)."); *State v. Burkhart*, 103 P.3d 1037, 1046–47 (Mont. 2004) (holding the felony-murder rule does not violate due process since intent to kill is not an element of the crime under the felony-murder rule); *State v. Bradley*, 317 N.W.2d 99, 101–02 (Neb. 1982) (rejecting defendant's argument that the felony-murder rule conclusively presumes malice from the criminal intention to commit certain felonies and therefore violates "the rule against irrebuttable presumptions [as] stated in *Mullaney v. Wilbur*, 421 U.S. 685, 96 S. Ct. 1881 . . . (1975)"); *State v. Campos*, 921 P.2d 1266, 1272 (N.M. 1996) ("[T]he felony-murder doctrine in New Mexico does not abandon the mens rea requirement for murder, nor does it create a presumption that a defendant had intended to kill whenever a homicide occurs during the course of a felony. Our felony-murder rule only serves to raise second-degree murder to first-degree murder when the murder is committed in the course of a dangerous felony." (Citation omitted.)); *State v. Swift*, 226 S.E.2d 652, 668–69 (N.C. 1976) (holding the felony-murder rule does not involve any presumption of premeditation and deliberation that would violate the Due Process Clause of the Fourteenth Amendment because those are not elements of the crime of felony murder); *Gore v. Leeke*, 199 S.E.2d 755, 757 (S.C. 1973) (holding the felony-murder rule did not violate the Due Process Clauses of the South Carolina and Federal Constitutions because it does not create a conclusive presumption of malice that would allow the "defendant to be convicted of murder without the State's proving the element of malice beyond a reasonable doubt"); *State v. Wanrow*, 588 P.2d 1320, 1325 (Wash. 1978) (en banc) ("The argument that the felony-murder presumes the existence of intent to kill misconstrues the nature of the felony-murder rule and must be rejected."), *superseded by statute as recognized in In re Pers. Restraint of Andress*, 56 P.3d 981, 984, 988 (Wash. 2002); *State ex rel. Peacher v. Sencindiver*, 233 S.E.2d 425, 426–27 (W. Va. 1977) (rejecting a constitutional challenge to the felony-murder rule under the Due Process Clauses because the felony-murder rule does not require a showing of malice and therefore does not create a presumption that defendant committed the killing with malice).

132 S. Ct. at 2464), for sentencing purposes due to "the features of youthful behavior, such as 'immaturity, impetuosity, and failure to appreciate risks and consequences.'" *Lyle*, 854 N.W.2d at 404 n.10 (quoting *Miller*, 567 U.S. at 477, 132 S. Ct. at 2468). Yet, we have never held or implied that these constitutionally recognized differences require our court or the legislature to transform the elements of any given offense to account for these differences. Harrison seeks to expand the scope of our juvenile sentencing jurisprudence far beyond its rational reach.

"Harm to a victim is not lessened because of the young age of an offender." *Propps*, 897 N.W.2d at 102. "[W]hile youth is a mitigating factor in sentencing, it is not an excuse." *Lyle*, 854 N.W.2d at 398 (quoting *Null*, 836 N.W.2d at 75). Consequently, our "constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today." *Propps*, 897 N.W.2d at 102 (quoting *Lyle*, 854 N.W.2d at 398). We do this by providing juveniles with an individualized sentencing process that incorporates a number of mitigating factors associated with "the features of youthful behavior." *Lyle*, 854 N.W.2d at 404 n.10; *see also Zarate*, 908 N.W.2d at 855–56. Nevertheless,

> the State has a legitimate interest in holding persons responsible for their criminal acts. When those acts are particularly serious, as in the case of forcible felonies, it is logical that the State would assign grave consequences to them . . . . "Having placed certain designated crimes committed by juveniles who have reached the age of sixteen within the criminal court jurisdiction, the legislature presumably thought the need for adult discipline and legal restraint was necessary in these cases."

*State v. Mann*, 602 N.W.2d 785, 792–93 (Iowa 1999) (quoting *State v. Terry*, 569 N.W.2d 364, 367 (Iowa 1997)).

Harrison does not provide us with any reason for further intruding upon the role of the legislature to expand our juvenile sentencing jurisprudence to hold that juvenile offenders cannot be tried for certain crimes altogether due to their mens rea requirements. No other state that has considered this issue has abolished the application of the felony-murder rule to juvenile offenders.[5] Moreover, despite the controversy surrounding the felony-murder rule, few states have actually abolished the felony-murder rule, and one of these states has only abrogated the common law felony-murder rule as opposed to a statutory version.[6] Notably, with the exception of Michigan, those states that have abolished the use of the felony-murder rule have done so through statutes enacted by their state legislatures as opposed to judicial abrogation.

---

[5]California is the only state we are aware of that has considered abolishing the application of the felony-murder rule to juvenile offenders on constitutional grounds. This was based on the argument that juvenile offenders cannot foresee the consequences of their actions. A California Court of Appeal rejected this argument. *People v. Richardson*, No. A134783, 2013 WL 2432510, at *5 (Cal. Ct. App. June 4, 2013) (rejecting a juvenile offender's argument that his conviction for felony murder violated his due process rights because his age rendered him incapable of foreseeing the consequences of his decision to participate in a robbery and noting that "[w]here, as in this case, the killing occurred during the course of an independent felony (robbery), Richardson's participation in the commission of that crime made him liable for the murder committed during the course of the robbery, even if the killing was *not* a natural, reasonable, or probable consequence of that crime").

[6]*See* Haw. Rev. Stat. Ann. § 707–701 (West, Westlaw through Act II of the 2018 Reg. Sess.) (first-degree murder requires the actor to commit the killing "intentionally and knowingly"); Ky. Rev. Stat. Ann. § 507.020 (West, Westlaw through Chs. 74, 96–154, 158–164, & 170 of 2018 Reg. Sess.) (first-degree murder requires "intent to cause the death of another person"); Ohio Rev. Code Ann. § 2903.01(B) (West, Westlaw through File 66 of 132d Gen. Assemb. (2017–2018)) (requiring a person to "purposely" cause the death of another during the course of a felony in order for the crime to meet the definition of aggravated murder); *People v. Aaron*, 299 N.W.2d 304, 328–29 (Mich. 1980) ("We conclude that Michigan has no statutory felony-murder rule which allows the mental element of murder to be satisfied by proof of the intention to commit the underlying felony. Today we exercise our role in the development of the common law by abrogating the common-law felony-murder rule.").

Further, Harrison misrepresents the felony-murder rule in his argument that it is premised on the ability to foresee danger. Though the inherent dangerousness of the forcible felonies encompassed within the felony-murder rule may make certain killings foreseeable, the felony-murder rule encompasses unforeseeable crimes. The premise of the rule is that there are certain felonies that "are so inherently dangerous that proof of participating in these crimes may obviate the need for showing all of the elements normally required for first-degree murder." *Heemstra*, 721 N.W.2d at 554. Robbery, especially armed robbery, requires the use of force and is "so inherently dangerous" that participating in it as the principal or aider and abettor in the manner that Harrison did carries with it an undeniable prospect of grave harm to the life of others. *See Conner*, 362 N.W.2d at 456.

> The fact that killing was not within the actual contemplation and intention of one of the parties to the robbery does not relieve such person of the responsibility as long as the other party to the robbery had the necessary *mens rea* and the act was a consequence of carrying out the unlawful common design.

*Id.* at 455. Thus, foreseeability is irrelevant to the felony-murder rule, and Harrison's alleged inability to foresee the consequences of his decision to participate in a robbery is likewise irrelevant to his conviction.

Finally, Harrison's contentions that he could not foresee the consequences of his decision to participate in a robbery, or that he could not control his impulses even if he could foresee the consequences, are irreconcilable with his admitted role in the commission of the robbery. Harrison admitted that he knew Collins was going to commit a "lick" when Harrison knowingly accompanied him to Hickman Lane that day. Harrison then lured McHenry to Collins and used force against him to help Collins carry out the robbery. By participating in robbery—a forcible

felony that the Iowa legislature has deemed inherently dangerous to human life—Harrison became liable for any killing committed in the commission of that offense by him or Collins. While there may be a unique factual situation in which the felony-murder rule is unconstitutional as applied to a certain juvenile offender, this is not that case. Therefore, we decline to hold that the felony-murder rule is fundamentally unfair or that it violates due process under the Iowa or United States Constitutions when applied to juvenile offenders pursuant to a theory of aiding and abetting.

**C. Sentencing Juveniles Convicted Under the Felony-Murder Rule.** Harrison presents both an as-applied and categorical constitutional challenge to his sentence of life imprisonment with immediate parole eligibility. Harrison argues that the sentence of life imprisonment with the possibility of immediate parole for juvenile offenders convicted of first-degree murder as an accomplice to felony murder constitutes cruel and unusual punishment under the Iowa and United States Constitutions. Further, Harrison claims his sentence of life imprisonment with the possibility of immediate parole is "grossly disproportionate to [his] ultimate[ ] culpability" since he "did not personally murder any individual, [and] no evidence was presented that he knew a murder would happen or was likely to happen."

1. *Categorical challenge.* We analyze categorical challenges to a sentence through a two-step inquiry. *Lyle*, 854 N.W.2d at 386. We first review " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." *Id.* (quoting *Graham*, 560 U.S. at 61, 130 S. Ct. at 2022). Next, we examine "our controlling precedents and our interpretation of the Iowa Constitution's text, history, meaning, and purpose to guide our own independent judgment on the

constitutionality of the challenged sentence." *Zarate*, 908 N.W.2d at 843. We also assess "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question," as well as whether the sentencing practice furthers legitimate penological goals. *Lyle*, 854 N.W.2d at 386 (quoting *Graham*, 560 U.S. at 67, 130 S. Ct. at 2026).

First, there is not a national consensus against sentencing juvenile offenders convicted of felony murder as the principal or accomplice to life imprisonment with immediate parole eligibility, and Harrison acknowledges this. In fact, he "is not aware of any state that has categorically held that life with the possibility of parole should be categorically prohibited for juveniles convicted of felony murder."[7] The

---

[7]We are also not aware of any state that has considered a categorical challenge to the specific sentence of life imprisonment with immediate parole eligibility for a juvenile offender convicted under the felony-murder rule. One state, North Carolina, has similarly considered a constitutional challenge to the sentence of life with the possibility of parole after a prison term of twenty-five years for a juvenile offender convicted under the felony-murder rule. *See State v. Jefferson*, 798 S.E.2d 121, 122–23 (N.C. Ct. App. 2017). The North Carolina Court of Appeals upheld the constitutionality of the sentence as applied to the defendant, noting it was "neither an explicit nor a *de facto* term of life imprisonment without parole." *Id.* at 125.

A few other states have considered the constitutionality of lengthy term of years sentences or sentences of life imprisonment for juvenile offenders convicted under the felony-murder rule. Those states have declined to find such sentences are categorically unconstitutional. *See Bell v. State*, No. CR 10–1262, 2011 WL 4396975, at *2–3 (Ark. Sept. 22, 2011) (rejecting defendant's petition for recall and resentencing involving his sentence to two consecutive life sentences for his convictions on two counts of first-degree murder committed as an accomplice when he was sixteen years old and that "[n]otwithstanding his claim that he was only an accomplice, we have held that there is no distinction between principals on the one hand and accomplices on the other, insofar as criminal liability is concerned"); *People v. Jordan*, No. D064010, 2016 WL 6996216, at *14 (Cal. Ct. App. Nov. 30, 2016) (upholding the twenty-five-year-to-life sentence of juvenile offenders convicted of felony murder noting other California appellate courts "have rejected arguments by juvenile offenders that a sentence for first degree murder violates the proportionality principle of the California Constitution even though the defendant was not the person who committed the killing, when the defendant knowingly participated in a serious crime that led to the murder"); *Arrington v. State*, 113 So. 3d 20, 27–28 (Fla. Dist. Ct. App. 2012) (declining to adopt a categorical rule prohibiting the sentence of life imprisonment without the possibility of parole for juvenile offenders convicted under the felony-murder rule); *State v. Ali*, 855 N.W.2d 235, 258–59 (Minn.

national consensus remains in favor of subjecting juvenile offenders convicted of first-degree murder under the felony-murder rule—regardless of whether an offender was aiding and abetting or the principal actor—to the same sentencing options as juvenile offenders convicted of premeditated first-degree murder.[8]

---

2014) (noting the constitutionality of life sentences for juveniles convicted of felony murder); *cf. Dillon*, 668 P.2d at 700–01, 727 (holding a seventeen year-old's sentence of life imprisonment for felony murder was unconstitutional as applied where the offender fatally shot his victim out of fear for his life in the course of trying to steal marijuana plants from the victim's farm when the victim—who had previously made threats about shooting the defendant for being on his property—began approaching the defendant with a shotgun in his possession.

[8]A sampling of the sentencing statutes of other states reveals that most states do not distinguish between premeditated murder and felony murder for the purpose of sentencing juvenile or adult offenders. *See, e.g.*, Ala. Code § 13A-6-2 (Westlaw through Act 2018–579) (classifying felony murder as first-degree murder and codifying the punishment for juvenile offenders who commit murder to be either life imprisonment without parole or life); Alaska Stat. Ann. § 11.41.100(a)(2)–(5) (West, Westlaw through ch. 7 of 2018 2d Reg. Sess.) (classifying felony murder as first-degree murder); *id.* § 12.55.125(b) (treating all types of first-degree murder the same for sentencing purposes); Ariz. Rev. Stat. Ann. § 13-1105(A)(2) (Westlaw through May 18, 2018 of 2d Reg. Sess.) (classifying felony murder as a form of first-degree murder); *id.* § 13-751(A)(2) (A juvenile offender convicted of first-degree murder "shall be sentenced to imprisonment in the custody of the state department of corrections for life or natural life."); Ark. Code Ann. § 5-10-101 (West, Westlaw through Acts 1–3, 5, 11, 12 & 13 from 2018 2d Extraordinary Sess.) (designating felony murder a capital offense and mandating any defendant under eighteen "at the time he or she committed the capital murder [be sentenced to] life imprisonment with the possibility of parole after serving a minimum of thirty (30) years' imprisonment"); Del. Code Ann. tit. 11, § 636 (classifying felony murder as murder in the first degree) (West, Westlaw through 81 Laws 2018, chs. 200–253); *id.* 4209A (All juvenile offenders who are convicted of first-degree murder "shall be sentenced to term of incarceration not less than 25 years to be served at Level V up to a term of imprisonment for the remainder of the person's natural life to be served at Level V without benefit of probation or parole or any other reduction."); Ga. Code Ann. § 17-10-6.1(a)(1), (c)(1) (West, Westlaw through Act 562 of 2018 Leg. Sess.) (listing "[m]urder or felony murder" as "serious violent felon[ies]" for which adult and juvenile offenders can be sentenced to life imprisonment with a minimum term of thirty years in prison before any form of parole eligibility is available); Idaho Code Ann. § 18–4004 (West, Westlaw through 2018 2d Reg. Sess.) ("[E]very person guilty of murder of the first degree shall be punished . . . by imprisonment for life."); *id.* § 18–4003(d) (classifying felony murder as first-degree murder); La. Stat. Ann. § 14:30(A) (Westlaw through 2018 1st Extraordinary Sess.) (defining first-degree murder, which includes felony murder); *id.* § 15:574.4(E)(1)(a) (A juvenile offender convicted of first-degree murder may become parole eligible after "[t]he offender has served twenty-five years of the sentence imposed"); Nev. Rev. Stat. Ann. § 200.030 (West, Westlaw through 2017 Reg. Sess.)) (classifying felony murder as

In addition to the national consensus in favor of treating felony murder and premeditated murder the same for sentencing purposes, there are objective indicia that the Iowa legislature has adopted this standard regarding the challenged sentencing practice. "Legislative judgments can be 'the most reliable objective indicators of community standards for purposes of determining whether a punishment is cruel and unusual.' " *Lyle*, 854 N.W.2d at 388 (quoting *State v. Bruegger*, 773 N.W.2d 862, 873 (Iowa 2009)). The legislature is aware of the different forms of first-degree murder, yet it has declined to treat them differently for sentencing purposes. This legislative decision to require mandatory life imprisonment with the possibility of immediate parole for juvenile offenders convicted of either premeditated murder or felony murder is indicative of a consensus in Iowa in favor of the challenged sentencing practice.

Despite the fact that there is no national consensus in opposition to the challenged sentencing practice based on the laws of other states, Harrison asks us to consider "that many legal scholars throughout the

---

first-degree murder and subjecting defendants convicted of first-degree murder to a minimum sentence of twenty years imprisonment before parole eligibility); Tex. Penal Code § 19.03 (West, Westlaw through 2017 Reg. & 1st Called Sess.) (including "capital felony" in the definition of "capital murder"); *id.* § 12.31(1) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for: (1) life, if the individual committed the offense when younger than 18 years of age.).

North Carolina is the only state we are aware of that differentiates between premeditated and felony murder for juvenile sentencing purposes. Under this statute, an offender convicted of first-degree murder under the felony-murder rule shall be sentenced "to life imprisonment with parole." N.C. Gen. Stat. Ann. § 15A-1340.19B(a)(1) (West, Westlaw through 2017 Reg. Sess.). For juvenile offenders, " 'life imprisonment with parole' shall mean that the defendant shall serve a minimum of 25 years imprisonment prior to becoming eligible for parole." *Id.* § 15A-1340.19A. Meanwhile, a defendant convicted of premeditated first-degree murder "should be sentenced to life imprisonment without parole . . . or a lesser sentence of life imprisonment with parole." *Id.* § 15-1340.19B(a)(2). Nevertheless, this sentencing scheme still requires juvenile offenders in North Carolina to serve a definite term of imprisonment that exceeds Harrison's sentence of life imprisonment with immediate parole eligibility.

country have not only routinely held that the felony murder rule is improper, but have specifically argued for the abolishment of the felony murder rule as applied to juveniles." Nevertheless, much of the scholarly criticism—including from some of the legal scholars Harrison cites—of applying the felony-murder rule to juveniles focuses on the sentence of life *without* parole that many jurisdictions impose on juveniles convicted of felony murder. *See, e.g.,* Steven A. Drizin & Allison McGowen Keegan, *Abolishing the Use of the Felony-Murder Rule When the Defendant Is a Teenager,* 28 Nova L. Rev. 507, 536, 541 (2004) (noting "it is debatable as to whether we should ease the prosecution's burden for a crime that can carry the death penalty or life without possibility of parole, and especially debatable when child defendants are involved and concluding that juveniles "convicted of felony murder should be exempted from the sentence of life without the possibility of parole"); Erin H. Flynn, Comment, *Dismantling the Felony-Murder Rule: Juvenile Deterrence and Retribution Post*-Roper v. Simmons, 156 U. Pa. L. Rev. 1049, 1068 (2008) ("If convicted of a felony-murder charge, juveniles are often subject to corresponding mandatory sentencing laws that remove a judge's discretion to account for a juvenile offender's individual characteristics and his level of threat to public safety."). We already quashed these concerns surrounding sentencing juveniles convicted of felony murder to life imprisonment without parole in *Sweet* where we held sentencing juvenile offenders to life imprisonment without the possibility of parole violates the Iowa Constitution. *See Sweet,* 879 N.W.2d at 839.

While there is not a national consensus against the sentencing practice at issue, this does not end our inquiry into Harrison's categorical challenge to sentencing juvenile offenders convicted of felony murder to life imprisonment with immediate parole eligibility. We still must "consider

our controlling precedents and our interpretation of the Iowa Constitution's text, history, meaning, and purpose to guide our own independent judgment on the constitutionality of the challenged sentence." *Zarate*, 908 N.W.2d at 843. Likewise, we must "evaluate whether the challenged sentencing practice serves legitimate penological goals." *Id.* This also requires us to examine "the culpability of the offenders at issue in light of their crimes and characteristics along with the severity of the punishment in question." *Lyle*, 854 N.W.2d at 386 (quoting *Graham*, 560 U.S. at 67, 130 S. Ct. at 2026).

"We seek to interpret our constitution consistent with the object sought to be obtained at the time of adoption as disclosed by the circumstances." *Chiodo v. Section 43.24 Panel*, 846 N.W.2d 845, 851 (Iowa 2014). Nevertheless, "originalism may not be the best guide for interpreting our constitution's cruel and unusual punishment clause in light of the changes to juvenile sentencing" since "juveniles over the age of fourteen were tried and sentenced as adults when our constitution was adopted." *Zarate*, 908 N.W.2d at 846. Yet, an analysis of our own juvenile sentencing jurisprudence supports sentencing juvenile offenders convicted of felony murder to life imprisonment with immediate parole eligibility.

Both our juvenile sentencing jurisprudence and that of the United States Supreme Court centers around the "fundamental and virtually inexorable difference between juveniles and adults for the purposes of punishment." *Lyle*, 854 N.W.2d at 393. Because of this difference, "juveniles convicted of crimes must be afforded a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Louisell*, 865 N.W.2d at 602 (quoting *Graham*, 560 U.S. at 75, 130 S. Ct. at 2030). Nevertheless, Harrison does not argue as part of his categorical

challenge that the sentence of life imprisonment with the immediate possibility of parole for juvenile offenders convicted of felony murder denies these offenders "a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' "[9]  *Id.*  Rather, he largely repeats the same argument he made with regard to banning the application of the felony-murder rule to juveniles—namely, that "juveniles lack the ability to form the proper foreseeability, lack the appreciation of consequences, and are highly impulsive."  However, we held in *Propps* that "[t]he constitutional analysis is not about excusing juvenile behavior, but imposing punishment in a way that is consistent with our understanding of humanity today."  *Propps*, 897 N.W.2d at 102 (alteration in original) (quoting *Lyle*, 854 N.W.2d at 398).

Thus, in our previous juvenile sentencing cases, "we sought to eliminate the mandatory nature of mandatory minimums and sentences that were the functional equivalent of life without parole because those sentences did not offer juveniles a 'meaningful opportunity' to demonstrate their rehabilitation before the parole board."  *Id.* at 101.  Consequently, unlike the mandatory life without parole that adults who commit first-degree murder are subject to, there is no mandatory minimum term of confinement for juvenile offenders convicted of first-degree murder.  *Compare* Iowa Code § 902.1(1) (2016), *with id.* § 902.1(2)(*a*)(2)–(3).  Likewise, Iowa provides juvenile offenders convicted of first-degree murder "with an individualized sentencing hearing that takes into account their youth and a number of other mitigating factors that provide juveniles with

---

[9]Harrison does argue along these lines in his reply brief regarding his as-applied challenge.  Specifically, Harrison notes that he is eligible for parole under his current sentence, but "the ability of parole appears to be a legal fiction more than a real opportunity."  Thus, we will address that argument as part of his as-applied challenge.

more leniency in the sentencing process." *Zarate*, 908 N.W.2d at 846. *Compare* Iowa Code § 902.1(1), *with id.* § 902.1(2)(*b*)(2)(a)–(v).

Similarly, the parole board provides juvenile offenders with "an individualized analysis that considers the juvenile's past, in addition to current psychiatric and psychological evaluations, the time already served on the sentence, any reports of misconduct or good behavior, and the inmate's attitude and behavior while incarcerated." *Propps*, 897 N.W.2d at 102; *see also* Iowa Code § 906.5(3). This individualized analysis allows the parole board to take into account the culpability of the offender, including the possibility that the offender was less culpable when he or she was aiding and abetting the principal actor in a felony-murder situation. We have repeatedly held that "the parole board [is] best situated to discern which juvenile homicide offenders have benefited from opportunities for maturation and rehabilitation." *Propps*, 897 N.W.2d at 102.

Unlike a sentencing judge, "[t]he parole board has the benefit of seeing the individual offender's actual behavior, rather than having to attempt to predict chances at maturity and rehabilitation based on speculation." *Id.* As a result, the parole board may decide to continue confinement of the juvenile "[i]f rehabilitation has not yet occurred" until he or she "has demonstrated through his or her own actions the ability to appreciate the severity of the crime." *Id.* "This is consistent with the approach of our prior holdings in the area of juvenile sentencing, because it allows for a realistic and meaningful opportunity for parole upon the juvenile's demonstration of maturity and rehabilitation." *Id.*

"In addition to our understanding and interpretation of the Iowa Constitution, we also consider whether the challenged sentencing practice serves legitimate penological goals and the culpability of the offender at

issue." *Zarate*, 908 N.W.2d at 847. We traditionally take into account the penological goals of rehabilitation, retribution, deterrence, and incapacitation. *Id.* Nevertheless, rehabilitation is the primary consideration in the juvenile sentencing context "due to the increased capacity of juveniles to reform in comparison to adults." *Id.* In *Zarate*, we held that the statutory juvenile sentencing options of life imprisonment with the possibility of immediate parole, or life imprisonment with parole eligibility after a minimum term of confinement, "align with our focus on rehabilitation and allow sentencing judges to acknowledge the fundamental concept of our juvenile sentencing jurisprudence that children are different from adults and should be treated differently due to their increased potential for rehabilitation." *Id.*

Despite our emphasis on rehabilitation, juvenile sentences may still aim to promote additional penological goals, including deterrence, retribution, and incapacitation. We previously noted this in *Roby*, explaining, "[I]t may be appropriate retribution to incarcerate a juvenile for a short time without the possibility of parole. Additionally, a sentencing judge could properly conclude a short term of guaranteed incarceration is necessary to protect the public." 897 N.W.2d at 142. Ultimately, "[c]riminal punishment can have different goals, and choosing among them is within a legislature's discretion." *State v. Oliver*, 812 N.W.2d 636, 646 (Iowa 2012) (alteration in original) (quoting *Graham*, 560 U.S. at 71, 130 S. Ct. at 2028).

Though Harrison is correct to note that deterrence and retribution are less applicable to juveniles due to their diminished culpability, they still carry "some weight depending on the circumstances of each case." *Zarate*, 908 N.W.2d at 854. As we declared in *Propps*, "[c]ompletely eliminating the mandatory imposition of a prison term, even when the term

is indeterminate and the individual is immediately eligible for parole, would not serve the proportionality concept we have addressed in our previous juvenile sentencing cases." 897 N.W.2d at 101. "While juveniles may be more prone to reform and rehabilitation because of their age and the attendant characteristics of youth, they must also understand the severity of their actions." *Id.* at 102. Frankly, the "[h]arm to [the] victim is not lessened because of the young age of [the] offender." *Id.* Thus, "while youth is a mitigating factor in sentencing, it is not an excuse." *Lyle*, 854 N.W.2d at 398 (quoting *Null*, 836 N.W.2d at 75).

Juvenile offenders who choose to participate in inherently dangerous felonies, whether they are the principal actor or aid and abet the felony, demonstrate a certain lack of maturity and impulse control that particularly implicates the penological goals of incapacitation and rehabilitation. "Nothing that the Supreme Court has said" or that we have said "suggests trial courts are not to consider protecting public safety in appropriate cases through imposition of significant prison terms." *Null*, 836 N.W.2d at 75. Harrison is claiming that juveniles have uncontrollable impulses due to their youth that limit their ability to appreciate the gravity of their participation in an inherently dangerous felony. Importantly, sentencing juvenile offenders in his position to life imprisonment with the possibility of immediate parole takes this into account by allowing the parole board to examine maturity and rehabilitation and provides such offenders with a meaningful opportunity for release as soon as they meet these goals.

Overall, "the legislature is in the best position to identify and adopt legal protections that advance our constitutional recognition that 'children are different.' " *Zarate*, 908 N.W.2d at 851 (quoting *Roby*, 897 N.W.2d at 144). The legislature sought to prescribe "the most severe sentences for

[juvenile] offenders convicted of murder in the first degree," including those juveniles convicted under the felony-murder rule. *Louisell,* 865 N.W.2d at 600. We are not in a position to undermine those goals given that the challenged sentencing practice aligns with our juvenile sentencing jurisprudence by promoting legitimate penological goals and providing juvenile offenders like Harrison with "a 'meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.' " *Id.* at 602 (quoting *Graham,* 560 U.S. at 75, 130 S. Ct. at 2030). Therefore, we hold that sentencing juvenile offenders convicted of felony murder—whether they were the principal actor or aided and abetted—to life imprisonment with immediate parole eligibility is constitutional under both the Iowa Constitution and the United States Constitution.

2. *As-applied challenge.* Harrison argues his sentence of life imprisonment with the immediate possibility of parole is unconstitutional as applied to him because it is grossly disproportionate to his ultimate culpability. The Iowa and United States Constitutions both prohibit cruel and unusual punishment. *See* U.S. Const. amend. VIII; Iowa Const. art. I, § 17. This prohibition "embraces a bedrock rule of law that punishment should fit the crime." *Bruegger,* 773 N.W.2d at 872.

We use a three-prong test to determine whether a sentence is grossly disproportionate under the Iowa and United States Constitutions. First, we examine "whether the sentence being reviewed is 'grossly disproportionate' to the underlying crime," which "involves a balancing of the gravity of the crime against the severity of the sentence." *Id.* at 873. This is the threshold question, and we do not inquire any further if the challenged sentence does not appear grossly disproportionate based on this balancing. *Oliver,* 812 N.W.2d at 650. If the threshold is met, we then engage in the second step of our analysis in which we partake in an

intrajurisdictional analysis, comparing the challenged sentence to sentences of other crimes in our jurisdiction. *Bruegger*, 773 N.W.2d at 873. Finally, we perform an interjurisdictional review, surveying the sentences for similar crimes in other jurisdictions. *Id.*

As we engage in this three-part inquiry, we must keep in mind certain general principles that help guide our determination of whether the challenged sentence is grossly disproportionate. "The first is that we owe substantial deference to the penalties the legislature has established for various crimes." *Oliver*, 812 N.W.2d at 650. Second, though we provide a more demanding review of a defendant's sentence for gross disproportionality under the Iowa Constitution than available under the United States Constitution, "it is rare that a sentence will be so grossly disproportionate to the crime as to satisfy the threshold inquiry and warrant further review." *Id.* Third, "a recidivist offender is more culpable and thus more deserving of a longer sentence than a first-time offender." *Id.* Finally, we analyze the facts of each case in reaching our threshold determination because they "can 'converge to generate a high risk of potential gross disproportionality.'" *Id.* at 651 (quoting *Bruegger*, 773 N.W.2d at 884).

For instance, in *Bruegger*, we held that the defendant's twenty-five year prison sentence for statutory rape was susceptible to an as-applied constitutional challenge because the unique features of the case "converge[d] to generate a high risk of potential gross disproportionality—namely, a broadly framed crime, the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime, and a dramatic sentence enhancement for repeat offenders." 773 N.W.2d at 868, 884. We vacated his sentence and remanded the case for a new sentencing hearing that considered the constitutionality of his sentence. *Id.* at 886.

Meanwhile, we held a sentence of life in prison without the possibility of parole for a defendant's second conviction of third-degree sexual abuse was not unconstitutional as applied to the defendant in *Oliver*. 812 N.W.2d at 651–53. In reaching this decision, we explained that the defendant's sexual exploitation of a minor who was twenty years younger than him was precisely the kind of exploitation that third-degree sexual abuse "was designed to prevent, not conduct that was inadvertently caught by a broadly written statute." *Id.* at 651.

Turning to the threshold inquiry, we cannot find that Harrison's sentence of life imprisonment with immediate parole eligibility for felony murder is grossly disproportionate to the underlying crime. Unlike the defendant in *Bruegger*, who committed an act "of lesser culpability" that fell within the scope of "a broadly-framed statute," felony murder does not encompass "acts of lesser culpability" since every felony murder requires a defendant's participation in a forcible felony that directly leads to the killing of the victim. *Bruegger*, 773 N.W.2d at 884; *see* Iowa Code § 707.2(1)(*b*). Harrison directly participated in a forcible felony as an aider and abettor, which directly led to the death of Aaron McHenry. His actions of luring the victim to Collins and physically shoving the victim to help set up the "lick" that resulted in the murder of McHenry are exactly the type of actions the felony-murder rule is meant to encompass. Though Harrison maintains he did not know ahead of time that Collins had a gun, Harrison was present when Collins shot McHenry, and he admitted he was in on the plan to rob McHenry. He was not an unknowing participant in the events that took place that day, and he showed no remorse during sentencing for his actions, simply declaring to the court, "[I]t's just crazy how I can just be judged by people that don't know what I've been through in my life." *See State v. Knight*, 701 N.W.2d 83, 88 (Iowa 2005) ("[A]

defendant's lack of remorse is highly pertinent to evaluating his need for rehabilitation and his likelihood of reoffending.").

Moreover, his sentence does not involve "the permissible use of preteen juvenile adjudications as prior convictions to enhance the crime and a dramatic sentence enhancement for repeat offenders" like the defendant in *Bruegger*. *See Bruegger*, 883 N.W.2d at 884. Harrison does not argue that he was denied an individualized sentencing as required under our juvenile sentencing jurisprudence. Because Harrison is a juvenile offender, the district court was required to consider a number of mitigating circumstances, including his culpability, "[t]he nature of the offense," "[t]he commission of the murder while participating in another felony," and "[t]he circumstances of the murder including the extent of the defendant's participation in the conduct and the way familial and peer pressure may have affected the defendant." Iowa Code § 902.1(2)(*b*)(2)(e), (i), (s). Based on the sentencing court's assessment of Harrison's participation in the felony murder, it sentenced him to the minimum possible sentence for first-degree murder.

Further, the legislature's decision to designate felony murder committed by either the principal or aider and abettor as first-degree murder reflects the seriousness of this offense. The legislature sought to prescribe "the most severe sentences for [juvenile] offenders convicted of murder in the first degree," including those juveniles convicted under the felony-murder rule. *Louisell*, 865 N.W.2d at 600. "[W]e owe substantial deference to the penalties the legislature has established for various crimes." *Oliver*, 812 N.W.2d at 650. This conviction for first-degree murder, as an aider or abettor under a felony-murder theory, is not the rare case in which the unique features of the case "can 'converge to

generate a high risk of potential gross disproportionality.' " *Id.* at 651 (quoting *Bruegger*, 773 N.W.2d at 884).

Finally, Harrison's argument that his sentence denies him of a meaningful opportunity for parole since "the ability of parole appears to be a legal fiction more than real opportunity" is not ripe for adjudication. We rejected similar arguments in both *Louisell* and *Zarate* since neither of those defendants had actually been denied parole in order to claim a legal violation. *See Zarate*, 908 N.W.2d at 847; *Louisell*, 865 N.W.2d at 601–02. The same ripeness issue occurs in this case since Harrison's claim is merely speculative. He has yet to appear before the parole board, and he does not provide any "basis for us to conclude that the parole board will fail to follow the law in a case that is presented to it, including his own." *Zarate*, 908 N.W.2d at 848.

In conclusion, life imprisonment with immediate parole eligibility for aiding and abetting in felony murder is not grossly disproportionate to the seriousness of the offense given the fatal harm Harrison helped enact on the life of another. Nevertheless, even if it were, Harrison's argument would fail under our intrajurisdictional and interjurisdictional analyses since he received the most lenient punishment given to offenders convicted of felony murder. *See* Iowa Code § 707.2; *id.* § 902.1. Likewise, as we have noted previously, there is no national consensus against sentencing juvenile offenders convicted of felony murder—as the principal actor or aider and abettor—to life imprisonment with immediate parole eligibility. Therefore, Harrison's sentence of life imprisonment with immediate parole eligibility does not constitute cruel and unusual punishment, either categorically or as applied to Harrison.

**D. Jury Instructions Regarding Robbery and the Felony-Murder Rule.** Harrison argues the jury instructions did not properly inform the

jury on the types of assault required to establish a felonious robbery. The jury was provided the following definitional instruction of robbery:

> A person commits a robbery when, having the specific intent to commit a theft, the person commits an assault to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property.

The jury instructions also informed the jury on the definition of assault through the standard model instruction for a simple misdemeanor assault.[10] In 2016, approximately two years after Harrison committed the robbery at issue, Iowa Code section 711.3A went into effect. This Code section codified third-degree robbery—a misdemeanor that could not serve as a predicate for felony murder. *See* [Iowa Code § 711.3A (2017)]. Harrison now argues this change in the Code should be applied to him retroactively and the jury should have been instructed on the types of assault that would constitute forcible felony robbery.

Iowa Code section 4.13(1) provides that "[t]he reenactment, revision, amendment, or repeal of a statute does not affect . . . the prior operation of the statute or any prior action taken under the statute." Iowa Code § 4.13(1)(*a*). Section 4.13 "does not require that the characterization of the crime of which [the defendant] is convicted be changed." *State v. Chrisman*, 514 N.W.2d 57, 63 (Iowa 1994). It is a well-settled law that

---

[10]Jury Instruction No. 28 defined "assault":

An assault is committed when a person does an act which is intended to either:

    1. cause pain or injury to another person; or

    2. result in physical contact which will be insulting or offensive to another person; or

    3. place another person in fear of immediate physical contact which will be painful, injurious, insulting or offensive to the other person when coupled with apparent ability to do the act.

substantive amendments to criminal statutes do not apply retroactively. *See, e.g., Nguyen v. State*, 878 N.W.2d 744, 754–56 (Iowa 2016) (holding both the Iowa and Federal Constitutions only require "retroactive application of *clarifications* to existing substantive law, not *changes* to substantive law"); *Dindinger v. Allsteel, Inc.*, 860 N.W.2d 557, 563 (Iowa 2015) ("It is well established that a statute is presumed to be prospective only unless expressly made retrospective." (quoting *Anderson Fin. Servs., LLC v. Miller*, 769 N.W.2d 575, 578 (Iowa 2009)). Since third-degree robbery did not exist in the Iowa Code at the time of Harrison's offense, Harrison was not entitled to a jury instruction differentiating between felony robbery and misdemeanor robbery.

**E. Ineffective-Assistance Claims.** Harrison presents a number of ineffective-assistance-of-counsel claims. Criminal defendants have the right to effective assistance of counsel under both the Iowa Constitution and the United States Constitution. U.S. Const. amend. VI; Iowa Const. art. I, § 10. "Generally, claims of ineffective assistance of counsel are preserved for postconviction relief proceedings." *State v. Soboroff*, 798 N.W.2d 1, 8 (Iowa 2011). Preserving these claims for postconviction relief allows the parties to develop an adequate record of the claims and provides the attorney charged with ineffective assistance with the "opportunity to respond to defendant's claims." *Id.* However, if "the record is adequate, we may resolve the claim on direct appeal." *Id.*

To prove ineffective assistance of counsel, the defendant must show "by a preponderance of the evidence both that counsel failed an essential duty and that the failure resulted in prejudice." *Schlitter*, 881 N.W.2d at 388. Since the defendant must show both prongs of this test have been met, we need not address the second prong regarding prejudice if the defendant fails to establish the first prong. *Nguyen*, 878 N.W.2d at 754.

Crafting a trial strategy is inherently difficult, so we "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Id.* at 752 (quoting *Strickland v. Washington,* 466 U.S. 668, 689, 104 S. Ct. 2052, 2065 (1984)). In accordance with this presumption, counsel fails his or her essential duty by "perform[ing] below the standard demanded of a reasonably competent attorney." *Ledezma v. State,* 626 N.W.2d 134, 142 (Iowa 2001).

Further, prejudice results from counsel's failure to perform an essential duty when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 143 (quoting *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068). To meet this standard, the defendant must show that, "absent the errors, the fact finder would have had a reasonable doubt respecting guilt." *Id.* (quoting *Strickland,* 466 U.S. at 695, 104 S. Ct. at 2068).

1. *Challenge to the use of felony robbery as a predicate felony.* This claim of ineffective assistance involves the jury instructions utilized by the district court. Therefore, the record is adequate to resolve this claim on direct appeal. *See Soboroff,* 798 N.W.2d at 8. The relevant jury instructions at issue are as follows:

> [a] person commits robbery when, having the specific intent to commit a theft, the person commits an assault to assist or further the commission of the intended theft or the person's escape from the scene thereof with or without the stolen property.
>
> . . . .

>An assault is committed when a person does an act which is intended to either: 1. Cause pain or injury to another person; or 2. Result in physical contact which will be insulting or offensive to another person; or 3. Place another person in fear of immediate physical contact which will be painful, injurious, insulting or offensive to the other person when coupled with the apparent ability to do the act.

"Under the merger doctrine, a person is only guilty of felony murder if the act resulting in the predicate felony is independent of the act resulting in death." *Tribble*, 790 N.W.2d 128. We have never extended the merger doctrine to hold that felony robbery cannot serve as the predicate felony for felony-murder purposes. Nonetheless, Harrison claims his trial counsel was ineffective by failing to request jury instructions requiring the State to prove the felony robbery was an independent act from the murder. Harrison reasons the merger doctrine should apply to his case because his actions that caused the robbery were the same actions that caused the victim's death. Thus, to determine whether Harrison's attorney failed an essential duty by declining to request jury instructions on the merger doctrine, we must examine the validity of Harrison's merger argument.

Harrison premises his argument largely on our holding in *Heemstra*, in which the defendant was convicted of first-degree murder under a general verdict after the defendant shot and killed the victim during the course of an argument. 721 N.W.2d at 551. In that case, the district court instructed the jury on both premeditated murder and felony murder, informing the jury that it was required to find either that "[t]he defendant acted willfully, deliberately, premeditatedly, and with specific intent to kill" the victim, or that the defendant participated in the felony of willful injury as the predicate felony to murder. *Id.* at 552–53. On appeal, we held, "if the act causing willful injury is the same act that causes the victim's death, the former is merged into the murder and therefore cannot serve as the

predicate felony for felony-murder purposes." *Id.* at 558. Consequently, the law requires the State to prove that felony assault was a separate act from the murder if felony assault is the predicate felony to murder given that "[d]eath is obviously a bodily injury." *Id.* at 555, 558 (quoting 4 Robert R. Rigg, *Iowa Practice Criminal Law* (1) § 3:16 (2006)). "Otherwise, all assaults that immediately precede a killing would bootstrap the killing into first-degree murder, and all distinctions between first-degree and second-degree murder would be eliminated." *Id.* at 557. Because the defendant's act of shooting the victim in *Heemstra* was both the act causing willful injury and the cause of the victim's death, we held the felony of willful injury merged into the murder and could not serve as the predicate felony for his felony-murder charge. *See id.* at 558.

In reaching this conclusion, we relied in part on a similar case from New York, *People v. Moran*, 158 N.E. 35 (N.Y. 1927), which held that the predicate felony in a felony murder case must be independent of the assault that caused the victim's death. *Heemstra*, 721 N.W.2d at 557–58. To explain the merger doctrine, we specifically quoted the portion of *Moran* that stated, "The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., *robbery* or larceny or burglary or rape." *Id.* at 558 (emphasis added) (quoting *Moran*, 158 N.E. at 36).

Since *Heemstra*, we have considered similar felony-murder cases predicated on the forcible felony of felonious assault. In *State v. Millbrook*, we held "the fact that intimidation with a dangerous weapon is not a lesser-included offense of first-degree murder does not preclude application of the merger doctrine enunciated in *Heemstra*." 788 N.W.2d 647, 652 (Iowa 2010). Nevertheless, we upheld the defendant's conviction because his act of aiding and abetting a codefendant in the commission of

intimidation with a dangerous weapon with intent was sufficiently independent of his own firing of the gun into the crowd that caused the victim's death. *Id.* at 652–54. Likewise, we examined our merger jurisprudence in *Tribble,* upholding a felony-murder conviction based on the felonious assault of willful injury due to the substantial evidence demonstrating the act of willful injury was sufficiently separate from the act of killing. *Tribble,* 790 N.W.2d at 128–29.

All of these cases dealt with the merger doctrine in relation to the forcible felony of assault, and none of them discussed extending the merger doctrine to cases that involve felony robbery as the predicate for felony murder. We even quoted other authorities in *Heemstra* that specifically stated the act of robbery was sufficiently independent from the act of killing to preclude it from being merged into the murder. *See Heemstra,* 721 N.W.2d at 556 ("Although rape, arson, robbery and burglary are sufficiently independent of the homicide, . . . aggravated battery toward the deceased will not do for felony murder." (quoting *Commonwealth v. Quigley,* 462 N.E.2d 92, 95 (Mass. 1984))); *see also id.* at 558 ("The felony that eliminates the quality of the intent must be one that is independent of the homicide and of the assault merged therein, as, e.g., robbery or larceny or burglary or rape." (quoting *Moran,* 158 N.E. at 36)). This is because robbery is clearly distinguishable from assault for the purpose of the merger doctrine.

Unlike the felonious assault at issue in *Heemstra,* felony robbery is not merely a less serious version of murder from which every felonious robbery ending in death could automatically be elevated to first-degree murder in the same way felonious assault could "bootstrap the killing into first-degree murder." *Heemstra,* 721 N.W.2d at 557. Rather, felony robbery is a distinct crime that necessitates the showing of a different

intent from the killing. Under Iowa Code section 711.1(1), robbery requires a showing that the defendant had the "intent to commit a theft" and that the defendant committed an assault "to assist or further the commission of the intended theft or the person's escape from the scene thereof." Iowa Code § 711.1(1). Therefore, the concern that, absent the merger doctrine, all felony robberies "that immediately precede a killing would bootstrap the killing into first-degree murder, and all distinctions between first-degree and second-degree murder would be eliminated" is not implicated here as it was with felonious assaults in *Heemstra*. *Heemstra*, 721 N.W.2d at 557. Moreover, robbery—unlike willful injury—is expressly listed as a forcible felony under section 702.11(1) to qualify as a basis for felony murder. *See* Iowa Code § 702.11(1). Based on the fundamental differences between felony robbery and felony assault in the felony-murder context, in addition to the merger rule jurisprudence in Iowa, it can hardly be said that trial counsel in this case "performed below the standard demanded of a reasonably competent attorney." *Ledezma*, 626 N.W.2d at 142.

2. *Evidentiary and testimonial objections*. Harrison also maintains his trial counsel was ineffective in failing to challenge certain testimony and evidence presented at trial. Harrison asserts that his trial counsel should have objected to testimony and evidence presented at his trial regarding his codefendant's conviction for first-degree murder in the death of McHenry. Harrison also challenges trial counsel's decision not to object to certain testimony from Detective Youngblut. Harrison challenges trial counsel's decision to allow the testimony of Shirley Dick from Collins's trial to be read into the record since Dick passed away before Harrison's trial. Finally, Harrison argues his trial counsel was ineffective in failing to object to the playing of Dick's 911 call for the jury. However, the record is

inadequate for us to address these claims. Like most claims of ineffective assistance of counsel, we preserve these claims for postconviction-relief proceedings "so an adequate record of the claim can be developed and the attorney charged with providing ineffective assistance may have an opportunity to respond to defendant's claims." *Soboroff*, 798 N.W.2d at 8.

**IV. Conclusion.**

For the aforementioned reasons, we affirm the conviction and sentence for Harrison and preserve the additional claims of ineffective assistance of counsel for postconviction-relief proceedings.

**AFFIRMED.**

All justices concur except Wiggins, and Appel, JJ., who dissent, and Hecht, J., who takes no part.

**APPEL, Justice (dissenting).**

The question in this case is whether an unarmed child may be subject to life in prison with the possibility of parole for participating in a marijuana robbery where a coparticipant brought a gun to the crime and killed the robbery victim.

## I. History of Felony Murder.

The origin of the felony-murder rule lies in the shadows of the past. Scholars have speculated that it arose because of a mistake made by Lord Coke in summarizing the legal texts of Lord Bracton when he substituted the word murder for homicide in describing death arising out of unlawful conduct. *See* Leonard Birdsong, *Felony Murder: A Historical Perspective by Which to Understand Today's Modern Felony Murder Rule Statutes*, 32 T. Marshall L. Rev. 1, 8–9 (2006) [hereinafter Birdsong]; *see also* James J. Tomkovicz, *The Endurance of the Felony-Murder Rule: A Study of the Forces That Shape Our Criminal Law*, 51 Wash. & Lee L. Rev. 1429, 1442 (1994) [hereinafter Tomkovicz] (citing the Lord Coke theory along with other possible origins of the felony-murder rule).

In any event, the felony-murder rule was controversial in its country of origin. *See* Guyora Binder, *The Origins of American Felony Murder Rules*, 57 Stan. L. Rev. 59, 101–02 (2004) (noting "learned opinions did not support felony murder rule unanimously"); Birdsong, 32 T. Marshall L. Rev. at 15 ("Some of the earliest reported jury instructions on the felony murder rule allude to its unpopularity, and seem to invite the jury to ignore it."); Rudolph J. Gerber, *The Felony Murder Rule: Conundrum Without Principle*, 31 Ariz. St. L.J. 763, 766 (1999) [hereinafter Gerber] ("The felony murder rule has an extensive history of thoughtful condemnation from at least 1834."). As a matter of practice, the felony-murder rule appears to

have been rarely used in England, and when it was, many cases tended to limit its scope by requiring that the defendant participate in an act of violence during the perpetration of the felony or that the killing involved must be a natural and probable consequence of the felon's actions. *See* Binder, 57 Stan. L. Rev. at 100–03. Yet, the vestiges of the felony-murder rule persisted in theory in England until 1957, when the felony-murder rule was abolished. Birdsong, 32 T. Marshall L. Rev. at 16.

The felony-murder rule took hold in America in the early years of the Republic. In 1794, Pennsylvania passed a statute that at least indirectly embraced felony murder. *Id.* at 17–18. The vast majority of states eventually followed suit. *Id.* at 18.

The felony-murder rule has been subject to extensive criticism. *See generally* Gerber, 31 Ariz. St. L.J. at 766–67, 770 (noting the rule suffers from at least four problems, each alone "fatal to a claim of principled justice"); Nelson E. Roth & Scott E. Sundby, *The Felony-Murder Rule: A Doctrine at Constitutional Crossroads*, 70 Cornell L. Rev. 446, 491–92 (1985) [hereinafter Roth & Sundby]; Joseph Trigilio & Tracy Casadio, *Executing Those Who Do Not Kill: A Categorical Approach to Proportional Sentencing*, 48 Am. Crim. L. Rev. 1371, 1408–11 (2011). The thrust of the criticism generally is that moral culpability is at the heart of criminal justice and that for harsh criminal sanctions to be imposed, the perpetrator must manifest the intent, or mens rea, to commit the crime. *See* Gerber, 31 Ariz. St. L.J. at 770–72.

The felony-murder rule has traditionally been defended on two grounds. First, it is said that the felony-murder rule embraces a theory of transferred intent, namely, that the intent of the cofelon who kills the victim during the course of a felony is transferred to others who participate in the crime. *See* Steven R. Morrison, *Defending Vicarious Felony Murder*,

47 Tex. Tech L. Rev. 129, 130, 138, 149 (2014). Under this theory, the traditional mens rea requirement of criminal law is satisfied. The problem with the transferred-intent theory is that it does not comport with facts on the ground. A cofelon may be shocked that his colleague in crime brought a gun, or a knife, to what the cofelon thought would be a petty crime.

The second theory is that the legislature in enacting a felony-murder rule has determined that mens rea is not required to support a conviction. *See* Kevin Cole, *Killings During Crime: Toward a Discriminating Theory of Strict Liability,* 28 Am. Crim. L. Rev. 73, 77, 98 n.82 (1990) [hereinafter Cole]. This theory seems more honest, but it amounts to a frontal assault on the traditional notion of criminal justice that a mens rea element is essential before the state imposes severe criminal sanctions. *See* John G. Malcolm, *Morally Innocent, Legally Guilty: The Case for Mens Rea Reform,* 18 Federalist Soc'y Rev. 40, 40–41 (2017).

Aside from legal theory, the felony-murder rule has been defended on a number of policy grounds. The rule is defended on the ground that it deters unlawful conduct that leads to the death. *See* David Crump & Susan Waite Crump, *In Defense of the Felony Murder Doctrine*, 8 Harv. J. L. & Pub. Pol'y 359, 369–71 (1985). It is also defended on grounds of retributive justice. *See* Cole, 28 Am. Crim. L. Rev. at 74–78, 121–32.

While the felony-murder rule has been adopted in most American jurisdictions, there has been a trend to limit its scope. Roth & Sundby, 70 Cornell L. Rev. at 446. The scope of felony murder has been limited through a number of techniques, including limiting the crimes from which felony murder may arise, imposing a requirement of proximate cause, requiring some showing of mens rea such as reckless indifference to human life, and adopting an affirmative defense where the cofelon did not participate in the killing in any meaningful way, was not armed with a

dangerous weapon, and had no reason to believe that the other participant intended to engage in conduct likely to result in death or physical injury. *Id.* at 446 & nn.7–8. As noted by one court, "the felony murder doctrine expresses a highly artificial concept that deserves no extension beyond its required application." *People v. Phillips*, 414 P.2d 353, 360 (Cal. 1966) (en banc), *overruled on other grounds by People v. Flood*, 957 P.2d 869, 882 n.12 (Cal. 1998).

The limitations of felony murder adopted in some jurisdictions have not satisfied critics. When the Model Penal Code was promulgated in 1962, it sharply criticized the felony-murder rule as inconsistent with traditional notions of criminal culpability. According to the commentary, "Principled argument in favor of the felony-murder doctrine is hard to find." Model Penal Code § 210.2 cmt. 6, at 37 (Am. Law Inst. 1980).

Academic commentators have continued to attack the felony-murder rule. The parade of negative commentary is long and winding. *See* Gerber, 31 Ariz. St. L.J. at 766 ("The felony murder rule has an extensive history of thoughtful condemnation."); John Calvin Jeffries Jr. & Paul B. Stephan III, *Defenses, Presumptions, and Burdens of Proof in the Criminal Law*, 88 Yale L.J. 1325, 1387 (1979) (citing "at least fifty years of sustained academic and judicial hostility" to the felony-murder rule); Jeanne Hall Seibold, *The Felony-Murder Rule: In Search of a Viable Doctrine*, 23 Cath. Law. 133, 160 (1978) ("The concept of basing the degree of punishment on the seriousness of the result of the criminal act seems grossly misplaced in a legal system which recognizes the degree of mental culpability as the appropriate standard for fixing criminal liability."); Tomkovicz, 51 Wash. & Lee L. Rev. at 1460–65 (noting that despite constant attack on the felony-murder rule, legislators feel pressures to placate a populace that does not care about treating felons fairly).

Yet, in most jurisdictions, some form of felony murder remains on the books. Kentucky, Hawaii, and Ohio have abolished it through legislative action. *See People v. Aaron*, 299 N.W.2d 304, 314 & nn.57–58 (Mich. 1980) (citing the Kentucky and Hawaii statutes); *Turk v. State*, 194 N.E. 425, 426 (Ohio Ct. App. 1934) (noting that the common law felony-murder rule is not the law in Ohio and citing Ohio statute that the state must show "purpose and intent to kill" for murder), *aff'd*, 194 N.E. 453 (Ohio 1935) (per curiam). In Michigan, the felony-murder rule has been substantially transformed by judicial ruling, if not eliminated. *See Aaron*, 299 N.W.2d at 325–26.

No one, of course, contends that participants in felonies are not deserving of punishment. A person who knowingly participates in a robbery has the necessary mens rea for a robbery and may be convicted and sentenced for that crime. In some cases, the participant may also have the necessary mens rea for a more serious offense, including involuntary manslaughter and even murder. What the critics insist, however, is that the traditional element of mens rea must accompany any such convictions with serious penological consequences.

## II. Background of Felony Murder in Iowa.

Iowa's current felony-murder statute was passed as part of the criminal code revisions adopted by the Iowa General Assembly in 1976 and made effective in 1978. 1976 Iowa Acts ch. 1245, ch. 1, § 702 (codified at Iowa Code § 707.2 (1979)).[11] The new statutory provision stated that "A person commits murder in the first degree when he or she commits murder under any of the following circumstances . . . [t]he person kills another person while participating in a forcible felony." Iowa Code § 707.2(2). The

---

[11]Prior to the modern version of the statute, Iowa's felony murder rule was codified at Iowa Code section 690.2 (1977).

statute further provided a list of crimes that were "forcible felonies," including, among other offenses, robbery. *Id.* § 702.11; *see generally* Douglas Van Zanten, Note, *Felony Murder, the Merger Limitation, and Legislative Intent in* State v. Heemstra: *Deciphering the Proper Role of the Iowa Supreme Court in Interpreting Iowa's Felony-Murder Statute,* 93 Iowa L. Rev. 1565, 1576–84 (2008).

In an early case decided shortly after the current felony-murder statute was enacted, we considered whether a showing of malice aforethought for murder was required under the statute. *See State v. Galloway,* 275 N.W.2d 736, 738 (Iowa 1979) (applying old version of felony-murder statute and noting recent Code changes did not alter the analysis), *abrogated on other grounds by State v. Schutz,* 579 N.W.2d 317, 320 (Iowa 1998). We answered the question in the affirmative. *Id.* In *Galloway*, the defendant objected to a jury instruction which did not require the prosecution to prove malice aforethought, but the court refused to add the requested language. *Id.* The *Galloway* court reversed, noting "[m]alice aforethought is a necessary element for murder. . . . And murder must be committed in order to implement our felony-murder rule." *Id.* In light of *Galloway*, it appears that while the common law felony-murder rule requires only a killing, the Iowa statute requires a murder. *See* Iowa Code § 707.2(1)(*b*) (2015) ("A person commits murder in the first degree when the person commits *murder* under any of the following circumstances: . . . [t]he person kills another person while participating in a forcible felony." (Emphasis added.)).

Yet, the situation has become clouded by the manner in which we have allowed malice to be proven. In *State v. Veverka,* 271 N.W.2d 744, 747 (Iowa 1978), we held that required malice "may be implied from circumstances such as an intent to commit a felony from which death

results." Although stated in permissive terms, an instruction providing that malice may be inferred from an intent to commit a felony from which death results sounds a lot like the common law rule, namely, that any killing can give rise to murder if it occurred in the course of a felony. *See* Kristy L. Albrecht, Note, *Iowa's Felony-Murder Statute: Eroding Malice and Rejecting the Merger Doctrine*, 79 Iowa L. Rev. 941, 950 & n.71 (1994) [hereinafter Albrecht]. Thus, in *State v. Taylor*, 287 N.W.2d 576, 578 (Iowa 1980), we again stated that malice may be shown by the commission of a felony, and in *Schrier v. State*, 347 N.W.2d 657, 666–67 (Iowa 1984), we held that counsel was not ineffective for failing to object to a felony-murder instruction that allowed the state to prove malice simply by proving an underlying felony. Under this approach, when the malice to support the murder element of Iowa's felony-murder statute is not independent of the commission of a felony, the legislature's limitation of felony murder to murders rather than mere killings does indeed ring "hollow." Albrecht, 79 Iowa L. Rev. at 955.

We considered questions related to the scope of felony murder in *Conner v. State*, 362 N.W.2d 449 (Iowa 1985). In *Conner*, the defendant challenged his first-degree murder conviction under the Iowa felony-murder rule on the ground that by presuming malice was present, the statute violated due process under the United States Constitution. *Id.* at 455. The defendant cited *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450 (1979), and its precursors for the proposition that a criminal statute violates due process if it imposes an irrebuttable presumption regarding facts necessary to support a conviction. *Conner*, 362 N.W.2d at 455–56.

In *Conner,* we departed from the transferred-intent model of analysis, which would have exposed the felony-murder rule to due process attack, and instead declared that elimination of the mens rea requirement

was not an irrebuttable presumption but instead "a matter of substantive law that places responsibility on a wrongdoer for the direct and indirect consequences of his joint criminal conduct with another." *Id.* at 456. We came to a similar conclusion in *State v. Ragland*, 420 N.W.2d 791, 794 (Iowa 1988), *overruled on other grounds by State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006). *Ragland* and *Conner* involved claims under the United States Constitution only. *Ragland*, 420 N.W.2d at 793; *Conner*, 362 N.W.2d at 455.

A significant question under the new felony-murder statute was whether we would recognize the merger rule, namely, that an assault that resulted in a homicide merged and could not provide the predicate felony for felony murder. In *State v. Beeman*, we declined to recognize the merger doctrine under our felony-murder statute. 315 N.W.2d 770, 777 (Iowa 1982), *overruled by Heemstra*, 721 N.W.2d at 558. We noted that felonious assault was listed by the legislature as one of the predicate offenses that could give rise to the felony-murder rule. *Id.* We therefore declined to adopt the merger rule. *Id.* We reaffirmed the *Beeman* holding in a number of cases. *See State v. Anderson*, 517 N.W.2d 208, 214 (Iowa 1994), *overruled by Heemstra*, 721 N.W.2d at 558; *State v. Rhomberg*, 516 N.W.2d 803, 805 (Iowa 1994), *overruled by Heemstra*, 721 N.W.2d at 558; *Ragland*, 420 N.W.2d at 793.

In *Heemstra*, we reconsidered the question of whether the felony of willful injury could be used as a predicate crime or whether willful injury merged with the resulting homicide to prevent application of the felony-murder rule. 721 N.W.2d at 554. In *Heemstra*, we charted a new course. *Id.* We noted that felony murder was one of the most controversial doctrines in the field of criminal law. *Id.* The *Heemstra* court noted that without the merger rule, the law could "test the outer constitutional

parameters of our felony-murder law." *Id.* at 555. We cited, among other things, a California case where the court had declared that refusing to recognize merger would extend the operation of the rule "beyond any rational function that it is designed to serve." *Id.* at 556 (quoting *People v. Ireland*, 450 P.2d 580, 590 (Cal. 1969) (en banc)). The *Heemstra* court was determined not to create what one commentator had called "an ever-expanding felony murder rule." *Id.* at 558 (quoting 4 Robert R. Rigg, *Iowa Practice Criminal Law (I)* § 3:16 (2006)).

Even with the limitations, the felony-murder rule has produced some troublesome results. In *Ragland*, a child knowingly participated in a fight with a rival group of children. 836 N.W.2d 107, 110 (Iowa 2013). During the course of the ensuing fight, one of his compatriots struck a person on the head with a tire iron, causing death. *Id.* The actual perpetrator of the crime plead guilty to second-degree murder and served a three-year prison sentence before being released. *Id.* at 112. Ragland went to trial, was convicted of felony murder, and received a life sentence. *Id.* at 110. In a letter to the county attorney, the actual perpetrator asked, "How can it be that I, the person who is actually directly responsible for [the victim's] death was given a second chance and am allowed to live freely in society, but Jeff Ragland is not?" *Id.* at 112.

**III. Felony-Murder Cases in Other States.**

**A. Introduction.** There have been relatively few cases challenging the constitutionality of the felony-murder rule. The older cases generally, however, reject due process challenges. *See, e.g., People v. Dillon*, 668 P.2d 697, 718 (Cal. 1983) (en banc); *State v. Nichols*, 734 P.2d 170, 177 (Mont. 1987); *Cotton v. Commonwealth*, 546 S.E.2d 241, 244 (Va. Ct. App. 2001). These cases tend to emphasize the ability of the legislature to define the crimes and then proceed to construe the scope of felony-murder statutes

as narrowly as possible.  A narrow result may be powered by the desire to avoid due process constitutional infirmities that might result from broader interpretations of felony-murder statutes.  *See, e.g., State v. Ortega*, 817 P.2d 1196, 1204 (N.M. 1991), *abrogated on other grounds by Kersey v. Hatch*, 237 P.3d 683, 689 (N.M. 2010).

**B.  *People v. Aaron.***  The first such case is *Aaron*, 299 N.W.2d 304. In this case, the Michigan Supreme Court, in a lengthy and highly footnoted opinion, considered the validity of the felony-murder rule in Michigan.  *Id.* at 324.  The *Aaron* court abrogated felony murder in that state.  *Id.* at 326.  Although the case does not directly deal with a constitutional challenge to a state statute, the approach of *Aaron* to the felony-murder rule is instructive on potential constitutional issues.

The *Aaron* court first surveyed caselaw and legislative developments regarding the felony-murder rule.  *Id.* at 312–16.  The court noted that the wisdom of the felony-murder rule had long been questioned, citing a Pennsylvania court's declaration stating "how shaky are the basic premises on which (the felony murder rule) rests" and a California decision characterizing the felony murder doctrine as expressing "a highly artificial concept."  *Id.* at 313–14 (first quoting *Commonwealth ex rel. Smith v. Myers*, 261 A.2d 550, 555 (Pa. 1970); and then quoting *Phillips*, 414 P.2d at 360).  The *Aaron* court cited numerous limitations placed on the felony-murder rule by courts and by legislatures.  *Id.* at 314–16.

The *Aaron* court next focused its discussion on the issue of moral culpability.  *Id.* at 316–17.  Citing authorities for the proposition that culpability represents a basic principle of criminal law, the court observed that the felony-murder rule "completely ignores the concept of determination of guilt on the basis of individual misconduct."  *Id.*  With respect to first-degree murder, the court noted that while murder

ordinarily requires "a showing of premeditation, deliberation and willfulness," felony murder "only requires a showing of intent to do the underlying felony." *Id.* at 317.

The *Aaron* court noted academic authorities that had condemned the felony-murder rule. *See id.* The court favorable cited a commentator who declared that "the felony-murder doctrine gives rise to what can only be described as an emotional reaction, not one based on logical and abstract principles." *Id.* (quoting Note, *Recent Extensions of Felony Murder Rule*, 31 Ind. L.J. 534, 543 (1956)). The court further cited a treatise that noted in 1771 it was observed that the felony-murder doctrine "is surely repugnant to that noble, and active confidence, which a free people ought to possess in the laws of their constitution, the rule of their actions." *Id.* at 318 (quoting Jerome Hall, *General Principles of Criminal Law* 455 (1947)).

In the end, the *Aaron* court held that malice is an essential part of any murder, whether it occurred in the course of a felony or otherwise. *Id.* at 319. The court emphasized that the necessary malice, in the appropriate case, might be inferred from the circumstances of the crime. *Id.* at 327. The issue of malice, however, is for the jury, which "may not find malice from the intent to commit the underlying felony alone." *Id.*

**C. *State v. Ortega.*** A second case of interest is *Ortega*, 817 P.2d 1196. The felony murder statute in New Mexico at the time was quite broad, triggered by *any* killing that occurred in the course of *any* felony. *Id.* at 1202. The New Mexico Supreme Court interpreted the statute, however, to require that the defendant "intended to kill (or had the state of mind otherwise generally associated with *mens rea*)." *Id.* at 1204. The *Ortega* court concluded that "proof that a killing occurred during the commission or attempted commission of a felony will no longer suffice to

establish murder in the first degree" under the felony-murder rule. *Id.* at 1205. Instead, according to the court, the state must show that the defendant had the mens rea sufficient to support second-degree murder, which then could be elevated to first-degree murder when a felony is involved. *Id.*

The *Ortega* decision was based on three propositions. *Id.* at 1204. First, the *Ortega* court emphasized that in Anglo-American law, serious nonregulatory crimes require criminal intent. *Id.* Second, if criminal intent is supplied merely by participation in a felony, the "one runs headlong into *Sandstrom.*" *Id.* Third, the *Ortega* court found its approach most consistent with the structure of the homicide provisions of New Mexico law. *Id.* at 1206.

**D. *Lowry v. State.*** The third case is *Lowry v. State*, 657 S.E.2d 760 (S.C. 2008). In *Lowry,* the South Carolina Supreme Court considered the constitutionality of jury instructions related to felony murder. *Id.* at 763. The challenged instruction stated felony murder arose if "a person kills another in the doing or attempting to do an act which is considered a felony." *Id.* at 762. The *Lowry* court held the trial court's supplemental jury charge created a mandatory presumption of the malice element and violated the defendant's due process rights. *Id.* at 764.

**E. *People v. Dillon.*** The fourth case worthy of note is *Dillon*, 668 P.2d 697. In *Dillon,* a seventeen-year-old boy was convicted of first-degree murder under California's felony-murder rule arising from an attempted robbery. *Id.* at 700. The defendant and others scouted a small marijuana farm on two prior occasions, only to be chased off by an owner armed with a shotgun. *Id.* A larger group engaged in a third foray, this time armed with various weapons including shotguns and a .22 caliber semi-automatic rifle possessed by Dillon. *Id.* at 701. They also brought various

equipment for harvesting the marijuana. *Id.* Some of the party left the scene after a couple of hours, but Dillon and his companion remained. *Id.* When the owner emerged in close proximity with his shotgun pointed outwards, Dillon shot him nine times with his rifle. *Id.* at 701, 723.

In *Dillon*, the child took the stand and described his state of mind, from youthful bravado to sheer panic as events unfolded. *Id.* at 722–23. With respect to the shooting, Dillon testified, "I just pressed the trigger, I was so scared . . . . I just kept squeezing it, and shots just went off." *Id.* at 723. A clinical psychologist testified regarding Dillon's immaturity, poor judgment and planning, and found him acting as a much younger child. *Id.* The psychologist testified that Dillon, when confronted with the armed owner, probably " 'blocked out' the reality of the situation and reacted reflexively, without thinking at all." *Id.*

The jury seems to have credited the child's testimony. *See id.* at 724. At the close of evidence, the jury sent the judge a note asking what the purpose of the psychologist's testimony was. *Id.* at 723. The court simply responded by directing the jury to follow the instructions. *Id.* During deliberations, the jury sent the judge a note asking whether it could convict the defendant of second-degree murder rather than first-degree murder. *Id.* at 724. The judge reread the instruction and further declared that if the defendant was guilty of felony murder, it must be murder in the first degree. *Id.* The jury convicted the defendant of attempted robbery and first-degree murder. *Id.*

The court advised the jury when discharging it that "[t]his felony murder rule is a very harsh rule and it operated very harshly in this case." *Id.* Yet, the court advised the jury that the court had an option of committing the defendant to the Youth Authority rather than sending him to prison. *Id.* The judge invited the jury to provide whatever observations

they might care to make about ultimate disposition of the case. *Id.* The foreman of the jury responded by stating that it was extremely difficult for the jurors to render the verdict since the defendant "by moral standards is a minor." *Id.* Expressing the consensus of most or all jurors, the foreman urged the judge to give the defendant "his best opportunity in life" by committing Dillon to the Youth Authority. *Id.* The district court followed the advice of the jury, but the Court of Appeals ruled that at the time the offense was committed, Dillon was ineligible as a matter of law to be committed to the Youth Authority. *Id.* at 725–26. The case was remanded for resentencing, and the district court, left with no choice, sentenced Dillon to life in prison. *Id.* at 726.

In reviewing the conviction and sentence, the California Supreme Court rejected challenges to felony murder based upon due process, reasoning that the legislature had defined the crime so as not to require a mens rea element for felony murder. *Id.* at 718. That, however, was not the end of the matter, as the court turned to the question of whether a first-degree murder conviction could be supported against the seventeen-year-old defendant under the facts and circumstances of the case. *See id.* at 719.

The court noted that the record showed that the defendant at the time of the events "was an unusually immature youth." *Id.* at 726–27. According to the court, the defendant was "not the prototype of a hardened criminal who poses a grave threat to society." *Id.* at 727. The court noted there was "ample evidence that because of his immaturity he neither foresaw the risk he was creating nor was able to extricate himself without panicking when that risk seemed to eventuate." *Id.* The court further noted the discrepancy in punishment of the defendant compared to his

coconspirators in the venture, who, although they did not pull the trigger, nonetheless had armed themselves with shotguns and knives. *Id.*

In the end, the court found life in prison violated the cruel and unusual punishment clause of the California Constitution. *Id.* Because he intentionally killed the victim without legal provocation, however, the defendant was guilty of second-degree murder. *Id.* The conviction was affirmed as modified, and the case remanded to the district court for resentencing. *Id.* Because the defendant was no longer guilty of first-degree murder, the district court on remand was "to determine whether to recommit him to the Youth Authority." *Id.*

### IV. Framework of Challenges to the Felony-Murder Rule.

**A. Transferred Intent and Due Process.** The notion that the felony-murder rule embraces a theory of transferred intent may be attacked on the ground that it violates due process and constitutes cruel and unusual punishment. The outlines of the argument were developed some decades ago by Roth and Sundby. *See* Roth & Sundby, 70 Cornell L. Rev. at 460–90.

The argument begins with *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068 (1970). In *In re Winship*, the United States Supreme Court emphasized that under the Due Process Clause of the United States Constitution, the accused is protected "against conviction except upon proof of every fact necessary to constitute the crime with which he is charged" beyond a reasonable doubt. *Id.* at 364, 90 S. Ct. at 1073. In *Mullaney v. Wilbur*, the Court emphasized that the state could not shift the burden of proof to the defendant to show "heat of passion" sufficient to avoid conviction of murder. 421 U.S. 684, 703–04, 95 S. Ct. 1881, 1892 (1975).

The Supreme Court then seemed to retreat from *In re Winship* and *Mullaney* in *Patterson v. New York*, 432 U.S. 197, 97 S. Ct. 2319 (1977). In *Patterson*, the Court upheld a state statute that required the defendant to prove the affirmative defense of severe emotional distress to a charge of murder. *Id.* at 205–06, 97 S. Ct. at 2324–25. Language in *Patterson* emphasized that the state had the power to define the elements of the crime. *Id.* at 205, 97 S. Ct. at 2324. At the same time, however, the court indicated that there were constitutional limits to the state's definitional power. *Id.* at 210, 97 S. Ct. at 2327.

The United States Supreme Court case revisited *Mullaney* and *Patterson* issues in *Sandstrom*, 442 U.S. 510, 99 S. Ct. 2450. In *Sandstrom* the trial court had instructed the jury that "the law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 512, 99 S. Ct. at 2453. The *Sandstrom* Court found the instruction flawed because it shifted the burden of proving intent. *Id.* at 524, 99 S. Ct. at 2459.

The felony-murder rule has been justified under a theory of "transferred intent," namely, that the mens rea required for murder is provided by imputing the mens rea from the defendant's felonious act. *See* Roth & Sundby, 70 Cornell L. Rev. at 453. Once a jury concludes that a killing had been committed in the course of the commission of a felony, the necessary culpability required for murder must be presumed. *See id.* at 460. The presumption of the necessary mens rea as arising out of something else—namely the commission of a felony where another has murdered someone—is subject to serious challenge under *Sandstrom*. *Id.* at 469.

**B. Legislative Definitions of Crime and Due Process and Cruel and Unusual Punishment.** As second theoretical defense of felony

murder eschews any fictitious transferred intent but emphasizes the ability of the legislature to define crimes. According to this theory, the legislature is free to enact a felony-murder rule that does not require the state to prove the traditional mens rea normally associated with the crime of murder. But a bedrock principle of criminal law has been that imposition of serious criminal sanctions ought to reflect culpability.

The United States Supreme Court considered the question of mens rea requirement in *Morissette v. United States*, 342 U.S. 246, 72 S. Ct. 240 (1952). In *Morissette*, the defendant had taken what he thought were abandoned shell casings from a government bombing range, compressed the shells, and sold the metal for $84. *Id.* at 247, 72 S. Ct. at 242. He was charged with conversion of government property. *Id.* at 248, 72 S. Ct. at 242. The trial court refused to allow the defendant to assert that he believed the property was abandoned on the ground that intent was presumed. The United States Court of Appeals for the Sixth Circuit affirmed, holding the statute did not require the government to prove criminal intent. *Id.* at 249–50, 72 S. Ct. at 242–48.

The Supreme Court reversed. *Id.* at 276, 72 S. Ct. at 256. In an opinion by Justice Jackson, the Court noted,

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil. A relation between some mental element and punishment for a harmful act is almost as instinctive as the child's familiar exculpatory "But I didn't mean to . . . ."

*Id.* at 250–51, 72 S. Ct. at 243 (footnote omitted).

Even where a statute did not expressly include an intent requirement, the *Morissette* Court emphasized "[c]ourts, with little

hesitation or division, found an implication of the requirement as to offenses that were taken over from the common law." *Id.* at 252, 72 S. Ct. at 244. The Court declined to depart from the common law mens rea requirement in light of the statutory silence in federal conversion law. *Id.* at 262, 72 S. Ct. at 249. Citing a state supreme court case, the Court noted, "It is alike the general rule of law, and the dictate of natural justice, that to constitute guilt there must be not only a wrongful act, but a criminal intention." *Id.* at 274, 72 S. Ct. at 255 (quoting *People v. Flack*, 26 N.E. 267, 270 (N.Y. 1891)). The Court recognized that while the mens rea element might be eliminated for certain regulatory crimes, the Court declined to do so for crimes under the federal conversion statute. *Id.* at 262–63, 72 S. Ct. at 249–50. While to do so might "ease the prosecution's path to conviction," it would "change the weights and balances in the scales of justice." *Id.* at 263, 72 S. Ct. at 249; *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 436–37, 98 S. Ct. 2864, 2873 (1978).

The United States Supreme Court considered the role of culpability in two felony-murder cases involving the death penalty in *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368 (1982), and *Tison v. Arizona*, 481 U.S. 137, 107 S. Ct. 1676 (1987). In *Enmund*, the Court considered a case in which a nontriggerman getaway driver was convicted of felony murder and sentenced to death. 458 U.S. at 784–85, 102 S. Ct. at 3370. In *Tison*, the Court considered a felony-murder case in which the defendants did not pull the trigger but were deeply involved in an underlying crime. 481 U.S. at 139–41, 107 S. Ct. at 1678–79.

In *Enmund*, the defendant drove the getaway car in an armed robbery. 458 U.S. at 784, 102 S. Ct. at 3370. His compatriots approached the targeted house and engaged in a fight with the occupants; as a result, the residents were killed. *Id.* at 784, 102 S. Ct. at 3369–70. Pursuant to

Florida law, the district court instructed the jury that "[t]he killing of a human being while engaged in the perpetration of or in the attempt to perpetrate the offense of robbery is murder in the first degree even though there is no premeditated design or intent to kill." *Id.* at 784–85, 102 S. Ct. at 3370 (alteration in original). The defendant was convicted and sentenced to death. *Id.* at 785, 102 S. Ct. at 3370. The defendant appealed, claiming that the imposition of the death penalty under the circumstances violated the Eighth Amendment proscription against cruel and unusual punishment. *Id.* at 787, 102 S. Ct. at 3371.

The Supreme Court agreed. *Id.* at 801, 102 S. Ct. at 3378–79. The *Enmund* Court emphasized that to impose the death penalty pursuant to a felony-murder conviction of a nontriggerman would not further either of the goals of deterrence or retribution. *Id.* at 800, 102 S. Ct. at 3378. With respect to deterrence, the Court noted that "if a person does not intend that life be taken . . . the possibility that the death penalty will be imposed for vicarious felony murder will not 'enter into the cold calculus that precedes the decision to act.' " *Id.* at 799, 102 S. Ct. at 3377 (quoting *Gregg v. Georgia*, 428 U.S. 153, 186, 96 S. Ct. 2909, 2931 (1976)). Aside from a lack of intent that might be deterred, the Court noted that there was no reason to believe that death so frequently occurs during the course of a felony that it would be a substantial deterrent to the underlying felony itself. *Id.* at 799, 102 S. Ct. at 3377–78. The *Enmund* Court further cited three studies that indicated the incidence of murder that occurred in connection with robberies hovered at only approximately .5%. *Id.* at 799–800 nn.23–24, 102 S. Ct. at 3378 nn.23–24.

The *Enmund* Court then turned to retribution. *Id.* at 800, 102 S. Ct. at 3378. The Court concluded that it was unconscionable to treat the triggerman and the nontriggerman alike for purposes of imposing the

death penalty. *Id.* at 801, 102 S. Ct. at 3378. According to the *Enmund* Court, "American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to 'the degree of [his] criminal culpability.'" *Id.* at 800, 102 S. Ct. at 3378 (alteration in original) (quoting *Mullaney,* 421 U.S. at 698, 95 S. Ct. at 1889). The defendant's punishment in *Enmund,* according to the Court, was not "tailored to his personal responsibility and moral guilt." *Id.* at 801, 102 S. Ct. at 3378.

The Court took a different tack in *Tison,* 481 U.S. 137, 107 S. Ct. 1676. In *Tison,* the Court considered whether the death penalty arising from felony murder could be applied in a case where the defendants were substantial participants in the crime and where they manifested a reckless disregard for human life. *See id.* at 139–41, 107 S. Ct. at 1678–79. In *Tison,* the defendants were involved in a carefully planned and heavily armed effort to free their father and another convicted murderer from prison. *Id.* at 139, 107 S. Ct. at 1678. The prison break at first succeeded, with the escapees and his rescuers fleeing the area in a Lincoln automobile. *Id.* at 139, 107 S. Ct. at 1679. When the car ultimately had a flat tire, the party flagged down a family in a passing vehicle. *Id.* at 139–40, 107 S. Ct. at 1679. The family was kidnapped and their car and the Lincoln driven into the desert. *Id.* at 140, 107 S. Ct. at 1679. While the family, standing in front of the Lincoln, pled for their lives, the father and another compatriot fatally shot the family. *Id.* at 140–41, 107 S. Ct. at 1679. The defendants at the time were near the other automobile where they had gone to fetch water for the victims. *Id.* The defendants were convicted of felony murder, sentenced to death, and lost their appeal. *Id.* at 141–43, 107 S. Ct. at 1680. They then launched a postconviction-relief

challenge to their death sentence, calling it cruel and unusual under the Eighth Amendment. *Id.* at 143, 152, 107 S. Ct. at 1680–81, 1685.

The *Tison* Court upheld the death sentences. *Id.* at 158, 107 S. Ct. at 1688. The Court observed that in *Enmund,* "the Court found that Enmund's degree of participation in the murders was so tangential that it could not be said to justify a sentence of death." *Id.* at 148, 107 S. Ct. at 1683 (emphasis omitted). In contrast, in *Tison,* the defendants participated extensively in the escape, intentionally brought guns into the prison to arm the murderers, participated fully in kidnapping and robbery, and, after the murders, did nothing to aid the victims. *Id.* at 151–52, 107 S. Ct. at 1685. Unlike in *Enmund,* the involvement of the defendants in the crimes was not minor, but "substantial." *Id.* at 158, 107 S. Ct. at 1688. The *Tison* Court held that the defendants' major participation in the felony committed, combined with reckless indifference to human life, was sufficient to satisfy the *Enmund* culpability requirement. *Id.*

Justice Brennan and three other members of the court dissented. *Id.* at 159, 107 S. Ct. at 1689 (Brennan, J., dissenting). According to Justice Brennan, the felony-murder rule was a curious "living fossil from a legal era in which all felonies were punishable by death." *Id.* Justice Brennan saw parallels with *Enmund. Id.* at 161, 107 S. Ct. at 1690. In both cases, the defendants did not shoot the victims and there was nothing in the record to indicate intent to kill. *Id.* Justice Brennan rejected the notion that a reckless actor could be held to the same degree of accountability as an intentional actor, noting that "[t]he reckless actor has not *chosen* to bring about the killing in the way the intentional actor has." *Id.* at 170, 107 S. Ct. at 1695. According to Justice Brennan, "the criminal law must ensure that the punishment an individual receives conforms to the choices that individual has made." *Id.* at 171, 107 S. Ct. at 1695. As

a result, Justice Brennan argued that the death penalty could not be imposed under the facts presented. *Id.* at 182, 107 S. Ct. at 1701.

**C. Application of Felony Murder to Children in Light of Recent Developments in Juvenile Justice.** As can be seen above, the felony-murder rule generally has substantial due process and proportionality problems. These well recognized challenges are greatly magnified in the context of juvenile offenders. This case involves more than the conventional challenges to felony murder, but because a child is involved the due process and cruel and unusual punishment claim are on legal steroids. A body of literature has recently developed suggesting that, at least as applied to children, the felony-murder rule is unconstitutional. *See* Steven A. Drizin & Allison McGowen Keegan, *Abolishing the Use of the Felony-Murder Rule When the Defendant Is a Teenager*, 28 Nova L. Rev. 507, 535–42 (2004) ("[W]e believe that there should be an absolute ban on the felony-murder doctrine for child defendants under the age of fourteen . . . ."); Emily C. Keller, *Constitutional Sentences for Juveniles Convicted of Felony Murder in the Wake of* Roper*,* Graham*, &* J.D.B., 11 Conn. Pub. Int. L.J. 297, 309–23 (2012) [hereinafter Keller] (arguing life sentences without parole for juvenile convicted of felony murder is unconstitutional).

Recent challenges to the application of felony murder to juveniles emphasize the juvenile justice cases recently decided by the United States Supreme Court. *See generally Miller v. Alabama*, 567 U.S. 460, 132 S. Ct. 2455 (2012); *J.D.B. v. North Carolina*, 564 U.S. 261, 131 S. Ct. 2394 (2011); *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010); *Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183 (2005). The thrust of the argument is that while the felony-murder rule is generally in a weak

position, it simply cannot be sustained with respect to juvenile offenders. *See* Keller*,* 11 Conn. Pub. Int. L.J. at 316–18.

First, critics note that the deterrence rational supporting felony murder is already weak with respect to adults. In *Enmund,* the Supreme Court stated that it was "quite unconvinced . . . that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken." 458 U.S. at 798–99, 102 S. Ct. 3377; *see also* Keller*,* 11 Conn. Pub. Int. L.J. at 317.

If the Court is unconvinced that the death penalty in the felony-murder rule is a deterrent for adults, the Court would surely be unconvinced that life in prison with the possibility of parole would provide a deterrent for children who do not intend that life will be taken. In *Graham,* for instance, the Supreme Court noted that juveniles "are less likely to take a possible punishment into consideration when making decisions." 560 U.S. at 72, 130 S. Ct. at 2028–29. In *Roper,* the Supreme Court noted "[t]he likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." 543 U.S. at 572, 125 S. Ct. at 1196 (alteration in original) (quoting *Thompson v. Oklahoma,* 487 U.S. 815, 837, 108 S. Ct. 2687, 2700 (1988)). As our court has noted, "children lack the risk-calculation skills adults are presumed to possess and are inherently sensitive, impressionable, and developmentally malleable." *State v. Lyle,* 854 N.W.2d 378, 389 (Iowa 2014); *see also* Keller, 11 Conn. Pub. Int. L.J. at 317–18. In *State v. Null,* we summed up the developments by noting that juvenile brains are not fully developed for executive functioning which effect behaviors "such as reasoning, abstract

thinking, planning, the anticipation of consequences, and impulse control." 836 N.W.2d 41, 55 (Iowa 2013).

Second, critics maintain that the retributive goals of criminal punishment have less force as applied to juveniles. Retribution is appropriate goal for morally culpable offenders. But the felony-murder rule does not require the individual mens rea ordinarily required to support a murder conviction. With respect to children, the retributive goals of the felony-murder rule are further diminished because of the characteristics of youth. *See Roper*, 543 U.S. at 571, 125 S. Ct. at 1196; *see also* Keller*,* 11 Conn. Pub. Int. L.J. at 316–17.

## V. Discussion.

Justice Frankfurter noted long ago that "not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community." *Irvin v. Dowd*, 366 U.S. 717, 729, 81 S. Ct. 1639, 1646 (1961) (Frankfurter, J., concurring). Harrison is guilty of significant crime and deserves to be punished accordingly. But the application of the felony-murder rule to him distorts the criminal justice system beyond recognition.

First, although he certainly had the necessary mens rea to commit the robbery, the instructions in this case *permitted* the jury to find that if he was guilty of the crime of robbery, Harrison was also guilty of felony murder, or murder in the first degree. For all the reasons in the authorities cited above, this is a troublesome state of affairs. In order to comport with fundamental fairness, the issue is not whether Harrison had sufficient moral culpability to support robbery. He did. The issue is whether Harrison had sufficient moral culpability to support first-degree murder and a life sentence with possibility of parole, merely because of his participation in the robbery. In order to support such a conviction

consistent with due process, the state must prove the elements of the underlying felony and, independently, sufficient malice to support a conviction of murder. Yet, the instructions permitted the jury to find Harrison guilty of murder without a finding of malice independent of the underlying felony.

Further, the limited moral culpability that may be assigned to Harrison is further diminished by the fact that he was a child. Without question, the teachings of *Miller*, *Graham*, and *Roper* establish that the moral culpability of juveniles even for horrendous crimes is diminished by their lack of neurological and psychological development. Thus, the very thin basis of culpability that might support the felony-murder rule in some circumstances is further diminished by the age of Harrison.

Second, there is the issue of deterrence. As was powerfully pointed out in *Enmund,* it is hard to understand how the felony-murder rule deters when the defendant has no intention to commit the crime. 458 U.S. at 798–99, 102 S. Ct. at 3377. As with moral culpability, the deterrence rationale for felony murder, already thin, is further diminished by the fact that Harrison was seventeen at the time of the offense.

It is true that in this case, Harrison was not sentenced to life in prison *without* the possibility of parole. Instead, he was sentenced to life in prison *with* the possibility of parole as required by *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016). Yet, there can be little doubt that his conviction of first-degree murder, albeit through a highly attenuated application of the felony-murder rule, is going to dramatically increase his prison term beyond that which he would have been imposed had he been convicted merely of robbery.

There is no occasion today to reconsider whether the felony-murder rule is categorically unconstitutional on grounds of due process as applied

to adults. That is not the issue before us. Instead, the question is whether the felony-murder rule as applied to children is so attenuated from traditional notions of due process of law. For the above reasons, I would conclude that application of the felony-murder rule to persons under the age of eighteen is so lacking in relationship to criminal culpability as to amount to a violation of due process under both the United States and the Iowa Constitutions.

I also write to express disagreement with the majority's approach to cruel and unusual punishment under the Iowa Constitution. First, I note that no party before this court has advocated that Iowa should not follow the standards for determining cruel and unusual punishment set out in *State v. Bruegger*, 773 N.W.2d 862, 884 (Iowa 2009), and *State v. Oliver*, 812 N.W.2d 636, 640 (Iowa 2012). We have not held that the federal standards are applicable under the Iowa Constitution as there has been no case where the issue has been contested.

In any rate, in applying the federal standards, I would not put much weight onto the national consensus in considering the issue before us. The exploration of national consensus is a technique utilized by the United States Supreme Court to address its federalism concerns, namely, a concern that the United States Supreme Court must set a nationwide standard. Such federalism concerns tend to dilute the scope of individual rights and drive the decision toward a lowest acceptable common denominator. Such federalism concerns simply are not applicable when a state considers a constitutional question that does not apply outside the state.

In addition, I do not agree with the majority's handling of *Bruegger* in considering an as-applied standard. In *Bruegger,* we found that there was reason to believe that an as-applied challenge under article I, section

17 may be present. 773 N.W.2d at 885. Among other factors, we cited the breadth of the underlying statute, Bruegger's age when the predicate offense was committed, and the geometric increase in criminal sanction. *Id.* at 884–85.

First, the breadth of the crime, the age of Bruegger when the predicate offense was committed, and the geometric increase in sentence, were *factors*, not *criteria*. The factors were never intended to establish a ceiling or ironclad set of criteria for determining whether a sentence was cruel and unusual under article I, section 17, but rather the general nature of the factors that may point in the direction of finding a sentence so grossly disproportional as to amount to a violation of article I, section 17.

Second, the *Bruegger* factors are met in this case. Although the Iowa felony-murder statute has been limited in important ways, it is still very broad. Any person who simply participates in a robbery may be found guilty of felony murder, even if that person did not bring a weapon to the scene, had no knowledge that weapons would be present at the scene, and had nothing to do with the murder. Also, Harrison was seventeen at the time of the crime. And, instead of being exposed to the sanction for the crime he clearly was guilty of committing, robbery, which carries a term of years sentence, Harrison was sentenced to life in prison with possibility of parole. There seems little doubt that Harrison's prison sentence under felony murder will be geometrically longer than that which would have resulted if he had been convicted only of robbery.

It is true, of course, that Harrison is eligible for parole. That, of course, might be a mitigating factor, particularly if eligibility for parole is considered soon after he has reached full maturity and correctional authorities have an opportunity to evaluate his rehabilitation. And a

meaningful opportunity to be heard must mean more than a paper review but must involve a serious assessment of the maturity and rehabilitation of the defendant. Even so, however, the difference between a sentence of life in prison with a meaningful opportunity to show rehabilitation and maturity after a decade in prison in substantially more severe than a mere conviction for robbery.

I find it unnecessary to reach the question of whether life without parole is categorically unconstitutional under article I, section 17, but I would hold that in this case, a life sentence with the possibility of parole, the harshest sentence available to a child, is grossly disproportional to what he deserves, namely, a sentence for robbery or perhaps involuntary manslaughter.

## VI. Conclusion.

For the above reasons, I respectfully dissent.

Wiggins, J., joins this dissent.